NO. B 96 3143    **Petitioner's Exhibit A**

COURT OF COMMON PLEAS

THE STATE OF OHIO

V S .

DERRICK REAVES

*DH*

*352664* ——————————— *6-1542433*

WARRANT ON AN INDICTMENT

For MURDER 2903.02A R.C.

*85A*

*101*

JOSEPH T. DETERS
Prosecuting Attorney

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THE STATE OF OHIO,    >    ss:  COURT  OF  COMMON  PLEAS.
HAMILTON COUNTY       >

Sheriff of our said County, Greetings:

We command you to take DERRICK REAVES if ___ may be
found within your bailiwick, and ___ safely keep, so that you have ___ bo.
before the COURT OF COMMON PLEAS in and for the County of Hamilton, at th
Courthouse in Cincinnati, in said County on the third day of May
A.D. 1996 at 8:30 A.M. Room No. 240 to answer unto the STATE OF OHIO on an
INDICTMENT for MURDER 2903.02A R.C.
and have then and there this writ.

WITNESS, JAMES CISSELL, Clerk of said Court, and
Seal of said Court, at Cincinnati, this twenty fourth
day of April in the year of our Lord one
thousand nine hundred and ninety-six.

JAMES CISSELL,
Clerk, Court of Common Pleas. Hamilton County, Ohio
By: X                                    Deputy

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Cincinnati. Ohio _____    I have the within named _____
in my custody and have served ____ with copy of indictment.
Serving indictment                     $2.00
Mileage _____ Miles
Serving warrant on indictment          $5.00
Mileage _____ Miles
                                       Total _____

        Sheriff

_____    Deputy

Westlaw.

Not Reported in N.E.2d
1998 WL 272959 (Ohio App. 1 Dist.)
**(Cite as: 1998 WL 272959 (Ohio App. 1 Dist.))**

Page 1

**c**
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio, First District, Hamilton
County.

State of OHIO, Plaintiff-Appellee,
v.
Charles **KILLINGS**, Defendant-Appellant.

**Nos. C-970167, C-970247.**

May 29, 1998.

Criminal Appeal From: Hamilton County Court of
Common Pleas Judgment Appealed From is:
Reversed and Cause Remanded.

Joseph T. Deters, Prosecuting Attorney, and
Ronald Springman, Assistant Prosecuting Attorney,
for Plaintiff-Appellee.

Hal Arenstein, for Defendant-Appellant.

M.B. BETTMAN, P.J., PAINTER and
SHANNON [FN*] JJ.

      FN* Judge Raymond E. Shannon, retired,
of the First Appellate District, sitting by
assignment.

*DECISION.*

PER CURIAM.

*1 We have, *sua sponte,* removed these appeals
from their placement upon the accelerated calendar.
[FN1]

      FN1. Appeal No. C-970167 is taken from

the judgment entered on the jury's verdict
of January 31, 1997, and is the primary
medium for the issues presented to us.
Appeal No. C-970247 pertains to the trial
court's March 19, 1997, denial of a motion
for a new trial. We have consolidated the
appeals for review.

Defendant-appellant Charles Killings advances
four assignments of error for our review with
respect to his conviction for rape.

An indictment was returned against appellant
charging him with one count of kidnapping and one
count of rape in connection with the sexual assaults
committed in June 1996 against a then
thirteen-year-old girl by appellant and two of his
friends, Sheldon Hibbard and Mario Ferguson. A
jury trial ensued, wherein the trial court, at the
state's request and upon the close of all the
evidence, included a general instruction to the jury
on complicity. Defense counsel had objected to the
inclusion of the complicity instruction on the basis
that appellant was not charged with complicity and
that its insertion at the trial's conclusion constituted
the addition of a new charge against which
appellant was unable to defend. Appellant was
found guilty of rape, but acquitted of the kidnapping
charge, and a sentence of ten to twenty-five years'
imprisonment was imposed.

Appellant's first assignment of error contends that
the trial court erred by instructing the jury on the
issue of complicity. We agree.

The facts contained in the record reveal that on the
afternoon of June 14, 1996, thirteen-year-old
Kristin Monsi and a friend were walking along Linn
Street in Cincinnati. At some point the girls were
approached by two males who were later identified
as Sheldon Hibbard and Mario Ferguson. The girls
declined the boys' offer to "party" and continued
walking, eventually crossing the street, at which
point they encountered the appellant. The
prosecution and defense presented conflicting
accounts of the facts after this point. According to a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
1998 WL 272959 (Ohio App. 1 Dist.)
(Cite as: 1998 WL 272959 (Ohio App. 1 Dist.))

defense witness, appellant was observed in an alley "hugging and kissing" a female teenager for over an hour. A police officer testified that appellant had stated that this "foreplay" culminated in consensual sex with Monsi. Monsi, on the other hand, essentially claimed that appellant chased her, placed her in an automobile that was occupied by Hibbard and Ferguson and forced her to engage in vaginal intercourse with appellant and Hibbard. One witness for the state testified that he heard screams while another witness stated that he saw one of the males standing "buck naked" in the alley where Monsi claimed to have been assaulted. In explaining the ordeal to the police, appellant stated that after he had intercourse with Monsi, Hibbard entered the automobile and had sex with her. Appellant further indicated that Mario Ferguson was to be "next" to have sex with Monsi, but that the police arrived before Ferguson "could make himself erect."

Appellant was charged in a two-count indictment with kidnapping [FN2] and rape. Appellant maintains that the indictment charged him with a single count of rape, and that therefore the inclusion of the complicity instruction to the jury was erroneous as a matter of law because it improperly held him accountable for the separate rape committed by his cohort, Sheldon Hibbard.

> FN2. The kidnapping charge is not at issue in this appeal, as appellant was found not guilty of that offense. Therefore, further references to "counts" in the indictment will be to the rape count unless otherwise specifically noted.

*2 In criminal prosecutions, the accused "shall not be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * * [and likewise] shall enjoy the right to be informed of the nature and cause of the accusation." Fifth and Sixth Amendments to the United States Constitution; see, also, Section 10, Article I, Ohio Constitution. "The purpose of these constitutional guarantees is quite clear: fundamental decency and civilized conduct require that an accused be permitted to defend himself fairly against crimes charged to him, and to do so, it is necessary that he be fully and fairly informed of the nature and cause of the accusations

against him. The fundament of such information is provided by the indictment." *State v. Crooks* (Dec. 12, 1984), Hamilton App. No. C-840184, unreported.

Pursuant to R.C. 2923.03(F), a charge of complicity may be stated in terms of R.C. 2923.03 or in terms of the principal offense. *State v. Caldwell* (1984), 19 Ohio App.3d 104, 483 N.E.2d 187. Where one is charged in terms of the principal offense, he is on notice, by operation of R.C. 2923.03(F), that evidence could be presented that the defendant was either a principal or an aider and abettor for that offense. See *State v. Dotson* (1987), 35 Ohio App.3d 135, 520 N.E.2d 240. Complicity simply defines circumstances which may connect one person with another in the commission or attempted commission of a crime. See *State v. Gaines* (Dec. 10, 1981), Cuyahoga App. No. 43257, unreported. Charging an individual with complicity allows one who aids and abets the commission of a crime to be charged as a principal when that person acts "with the kind of culpability required for the commission of an offense * * *." R.C. 2923.03(A)(2); *State v. Gaines, supra.*

At trial, the state presented evidence to support its position that appellant had indeed taken Monsi against her will and raped her. Appellant, in turn, presented evidence to establish his position that Monsi engaged in consensual sex with him. The focus and, naturally, the point of the trial was to establish either guilt or innocence with respect to appellant's alleged act of rape. Details involving the actions of Sheldon Hibbard were presented as incidental to those of appellant and surfaced not to prove appellant's guilt in Hibbard's separate sexual assault against Monsi, but rather to provide the entire factual backdrop surrounding the incident.

The case before us is similar to the facts presented in *State v. Crooks* (Dec. 12, 1984), Hamilton App. No. C-840184, unreported. In *Crooks*, a two-count indictment was returned against the defendant, charging him with rape by vaginal intercourse and rape by fellatio. The charges arose out of separate incidents of alleged forcible vaginal rape and oral intercourse that were accompanied by similar acts committed by an unknown companion who evaded apprehension. The evidence adduced at trial suggested that the defendant was unable to attain an

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
1998 WL 272959 (Ohio App. 1 Dist.)
(Cite as: 1998 WL 272959 (Ohio App. 1 Dist.))

Page 3

erection and that, consequently, he aborted his attempt at vaginal rape. Testimony did establish, however, that the companion engaged in vaginal intercourse with the victim. When the defense moved for an acquittal at the close of the state's case, the trial court overruled the motion, finding sufficient evidence to charge the defendant as a principal on the fellatio rape count and sufficient evidence of force and penetration to charge him as a complicitor in the vaginal rape of the victim by the unidentified companion. The court included a general jury instruction on complicity, and the jury subsequently returned guilty verdicts against the defendant on both counts.

*3 On appeal, we determined that constitutional due process rights had been violated because the defendant had no notice either by way of his indictment or through a bill of particulars that he could have been held accountable for the acts of his companion as an aider and abettor. We concluded that the application of R.C. 2923.03(F) and Crim.R. 7(D) to allow for an instruction on complicity where the original indictment failed to inform the defendant that he could be held responsible as an aider and abettor resulted in a prejudicial and unconstitutional amendment of the indictment. Specifically, we held:
We take it to be unarguable that R.C. 2923.03(F) and Crim.R.7(D) are sustainable as against [challenges based upon] the fifth and sixth amendments of the federal Constitution, and article 1, section 10 of the Ohio Constitution only to the extent that they do not materially or seriously infringe the right of a defendant to be informed of the nature and cause of the accusation.

* * *
As it was, the defendant had no idea nor reason to suspect that he was placed in jeopardy by the two count indictment of conviction as a complicitor in the acts of his companion until the trial court's ruling on his Crim.R. 29 motion at the conclusion of the state's case. Under such circumstances, we simply cannot assume that the defendant was adequately informed of the nature and cause of the accusation in a fashion permitting him his undoubted right to present a reasonable and adequate defense to the latter charges.
See, also, State v. Staten (Nov. 7, 1989), Franklin

App. No. 88AP-841, unreported (wherein the Tenth Appellate District determined that an instruction on complicity was erroneously provided to the jury on the basis that a companion's crime was not identified in the original indictment or properly added as an amendment to the indictment so as to provide the defendant with adequate notice and an opportunity to defend).

As we have noted, the indictment in the instant case charged appellant as the principal offender in a single count of rape. After the trial court agreed to include the charge on complicity at the close of all the evidence, appellant, charged in the indictment with only one crime, found himself placed in jeopardy of two distinct crimes: one as principal to his own alleged rape of Monsi and one as an aider and abettor to Sheldon Hibbard's separate and distinct crime against Monsi. Under the court's instruction, then, the jury could have found appellant guilty of the rape as a principal or guilty of a separate rape as an aider and abettor, although he was afforded an opportunity to defend only against the count charging him as the principal in his own act of rape.

It is impossible to determine with certainty on what act the guilty verdict was based. As appellant argues in his brief, under the facts of this case, it is quite clear that the state could have indicted appellant on two counts, one as a principal and one as an aider and abettor. While the latter may have been phrased, pursuant to R.C. 2923.03(F), in terms of either principal or complicitor status, the separation into two counts would have at least provided appellant with sufficient insight into his potential liability and made clear any questions concerning the factual basis for the additional count of rape. See Crooks, supra.

*4 Accordingly, we are convinced that appellant's due process rights were violated by the court's inclusion of the instruction on complicity. Consequently, we are compelled to sustain appellant's first assignment of error and to reverse his conviction and remand the case for a new trial.

Based upon our disposition of the first assignment of error, it is unnecessary for us to address the merits of the remaining three assignments of error. See App.R. 12(A)(1)(c).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
1998 WL 272959 (Ohio App. 1 Dist.)
**(Cite as: 1998 WL 272959 (Ohio App. 1 Dist.))**

Therefore, the judgment of the trial court is reversed and the cause remanded for further proceedings consistent with law.

*Judgment reversed and cause remanded.*

1998 WL 272959 (Ohio App. 1 Dist.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

Page 1

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Sixth Circuit.
Kenneth T. **RICHEY**, Petitioner-Appellant,
v.
Betty **MITCHELL**, Warden, Respondent-Appellee.
**No. 01-3477.**

Argued: May 7, 2003.
Decided and Filed: Jan. 25, 2005.

**Background:** Petitioner was convicted in state court of aggravated felony murder and sentenced to be executed. Petitioner's appeals in state court were not successful, 1989 WL 156561, 1989 WL 156562, and 64 Ohio St.3d 353, 595 N.E.2d 915. Petitioner applied for, but was denied, state post-conviction relief, 64 Ohio St.3d 353, 595 N.E.2d 915, 73 Ohio St.3d 523, 653 N.E.2d 344, 1997 WL 722782, and 2000 WL 681642. Petitioner applied for writ of habeas corpus. The United States District Court for the Northern District of Ohio, Patricia A. Gaughan, J., denied petition. Petitioner appealed.

**Holdings:** The Court of Appeals, Cole, Circuit Judge, held that:
(1) evidence was not sufficient under Ohio law to convict petitioner of aggravated felony murder based upon transferred intent;
(2) state procedural rule which required petitioner to raise claim at trial or on direct appeal did not constitute "independent" state law ground to prevent federal habeas review;
(3) trial and appellate counsel provided ineffective assistance, thereby excusing trial and appellate procedural defaults for cause;
(4) state rule which required good cause to reopen appeal to claim ineffective assistance of appellate counsel was not "adequate" basis to preclude federal relief of petitioner's ineffective assistance of appellate counsel claim;

(5) petitioner was prejudiced by ineffective assistance of trial and appellate counsel;
(6) petitioner's claim, that his trial counsel was constitutionally ineffective in the way he handled his forensic expert and his failure to challenge scientific evidence of arson, had not been procedurally defaulted;
(7) trial counsel provided ineffective assistance in the way he handled his forensic expert and his failure to challenge scientific evidence of arson; and
(8) petitioner was prejudiced by ineffective assistance of trial counsel in the way he handled his forensic expert and his failure to challenge scientific evidence of arson.
Reversed and remanded.

Siler, Circuit Judge, filed dissenting opinion.

### West Headnotes

**[1] Habeas Corpus ⟨⟩493(3)**
197k493(3) Most Cited Cases
Decision of Ohio Supreme Court, that evidence was sufficient under Ohio law to convict petitioner of aggravated felony murder based upon transferred intent, was contrary to, or involved unreasonable application of, clearly established federal due process law, and thus, petitioner was entitled to federal habeas relief, since text of statute and its treatment by Ohio courts at time of petitioner's conviction and state appeals strongly indicated that transferred intent could not have been applied to aggravated felony murder and there was no showing that petitioner intended to kill person who actually died. U.S.C.A. Const.Amend. 14; 28 U.S.C.A. § 2254; Ohio R.C. § 2903.01 .

**[2] Constitutional Law ⟨⟩266(7)**
92k266(7) Most Cited Cases
The federal constitution's due process clause forbids a state to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt. U.S.C.A. Const.Amend. 14.

**[3] Criminal Law ⟨⟩25**
110k25 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

Page 2

In Ohio, the doctrine of transferred intent is not so over-arching as to be automatically applicable in proving all intent crimes.

**[4] Habeas Corpus ⟲463.1**
197k463.1 Most Cited Cases
Federal court on habeas review of petitioner's aggravated felony murder conviction, when determining what required elements of aggravated felony murder were, was required to adhere to specific pronouncements by Ohio state courts at time of petitioner's conviction and state appeals. 28 U.S.C.A. § 2254; Ohio R.C. § 2903.01.

**[5] Statutes ⟲241(1)**
361k241(1) Most Cited Cases
To the extent that a statute is ambiguous, the rule of lenity ensures that the requirement of fair warning is met by resolving doubts in favor of the defendant.

**[6] Habeas Corpus ⟲423**
197k423 Most Cited Cases
State procedural rule which required petitioner to raise claim at trial or on direct appeal did not constitute "independent" state law ground to prevent federal habeas review of petitioner's claim regarding transferred intent on his aggravated felony murder conviction, since Ohio Supreme Court considered general claim regarding transferred intent, federal court was required to interpret any ambiguity to mean that Ohio Supreme Court reached issue of transferred intent, and Ohio Supreme Court did not hold, or even intimate, that petitioner forfeited chance to contest sufficiency of evidence supporting his conviction. 28 U.S.C.A. § 2254; Ohio R.C. § 2903.01.

**[7] Habeas Corpus ⟲401**
197k401 Most Cited Cases

**[7] Habeas Corpus ⟲404**
197k404 Most Cited Cases

**[7] Habeas Corpus ⟲422**
197k422 Most Cited Cases
In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. 28 U.S.C.A. § 2254.

**[8] Habeas Corpus ⟲422**
197k422 Most Cited Cases
Adequacy
In the habeas context, under the Antiterrorism and Effective Death Penalty Act (AEDPA), a ground is "independent" to deny a defendant relief on a claim only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar. 28 U.S.C.A. § 2254.

**[9] Habeas Corpus ⟲423**
197k423 Most Cited Cases
In the habeas context, under the Antiterrorism and Effective Death Penalty Act (AEDPA), a lapsed claim survives if the state court overlooked the default and decided the claim anyway. 28 U.S.C.A. § 2254.

**[10] Habeas Corpus ⟲406**
197k406 Most Cited Cases
In the habeas context, ineffective assistance of counsel can supply the cause that, together with prejudice, would excuse a procedural default under the Antiterrorism and Effective Death Penalty Act (AEDPA). U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254.

**[11] Habeas Corpus ⟲406**
197k406 Most Cited Cases
Trial and appellate counsel provided "ineffective assistance" by not claiming in trial court and on direct appeal that there was not sufficient evidence to convict petitioner on aggravated felony murder charge, thereby excusing trial and appellate procedural defaults for cause on federal habeas review, since there was no showing that petitioner intended to kill person who actually died and text of statute and its treatment by Ohio courts at time of petitioner's conviction and state appeals strongly indicated that transferred intent could not have been applied to aggravated felony murder. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254; Ohio R.C. § 2903.01; Ohio Rules App.Proc., Rule 26.

**[12] Habeas Corpus ⟲403**
197k403 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

State rule which required good cause to reopen appeal to claim ineffective assistance of appellate counsel was not "adequate" basis to preclude federal habeas review of petitioner's ineffective assistance of appellate counsel claim, since rule had not been firmly established and regularly followed at time it was applied. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254; Ohio Rules App.Proc., Rule 26
.

**[13] Habeas Corpus ☞403**
197k403 Most Cited Cases
A state procedural rule is adequate to preclude federal habeas review under the Antiterrorism and Effective Death Penalty Act (AEDPA) if it is regularly or consistently applied by the state court. 28 U.S.C.A. § 2254.

**[14] Criminal Law ☞641.13(2.1)**
110k641.13(2.1) Most Cited Cases
In the context of a claim of ineffective assistance of counsel, defense counsel in a criminal case should have understood the elements of the offenses with which his client was charged and should have displayed some appreciation of the recognized defenses thereto. U.S.C.A. Const.Amend. 6.

**[15] Habeas Corpus ☞409**
197k409 Most Cited Cases
Petitioner was "prejudiced" by ineffective assistance of trial and appellate counsel, who did not claim in trial court or on direct appeal that specific intent was requirement of aggravated felony murder charge and state failed to meet that requirement, thereby excusing trial and appellate procedural defaults of petitioner's transferred intent and sufficiency claims for cause on federal habeas review; state could not convict someone of aggravated felony murder without proving specific intent to kill person who was actually killed and state did not prove specific intent to kill victim. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254; Ohio R.C. § 2903.01.

**[16] Habeas Corpus ☞365**
197k365 Most Cited Cases

**[16] Habeas Corpus ☞366**
197k366 Most Cited Cases
Habeas petitioner's claim, that his trial counsel was constitutionally ineffective in the way he handled

his forensic expert and his failure to challenge scientific evidence of arson, had not been procedurally defaulted, since counsel's alleged ineffective handling of scientific evidence depended almost entirely on evidence outside of trial record and thus petitioner was prohibited from raising claim on direct appeal, and petitioner raised claim during his post-conviction challenge and state courts evaluated and decided it on the merits. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254.

**[17] Criminal Law ☞641.13(6)**
110k641.13(6) Most Cited Cases
Trial counsel provided "ineffective assistance" in the way he handled his forensic expert and his failure to challenge scientific evidence of arson, where case was anchored by scientific evidence, expert did not conduct any independent analysis, counsel did not screen, supervise, or engage his expert, expert testified for state, and counsel did not understand evidence in order to support his client's position and cross-examine his own or state's experts. U.S.C.A. Const.Amend. 6.

**[18] Criminal Law ☞641.13(6)**
110k641.13(6) Most Cited Cases
Petitioner was "prejudiced" by ineffective assistance of trial counsel in the way he handled his forensic expert and his failure to challenge scientific evidence of arson, where counsel would have been able to find competent expert had he bothered to look for one, competent expert would have undermined state's evidence that fire was caused by arson, and there was absence of corroborating physical evidence. U.S.C.A. Const.Amend. 6.
**\*663 ARGUED:** Paul E. Nemser, Goodwin Procter LLP, Boston, Massachusetts, for Appellant. Michael L. Collyer, Office of the Attorney General of Ohio, Cleveland, Ohio, for Appellee. **ON BRIEF:** Paul E. Nemser, Kenneth J. Parsigian, Goodwin Procter LLP, Boston, Massachusetts, for Appellant. Michael L. Collyer, Office of the Attorney General of Ohio, Cleveland, Ohio, for Appellee.

Thomas F. Bush, Jr., Paul B. Ockene, Adam Goodman, Yasmin Waljee (admitted in England only), Lovells, Chicago, IL, for Amicus Curiae Law Society of England and Wales, Human Rights Committee of the Bar of England and Wales and the Parliamentary Supporters of Kenneth T. Richey.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

Page 4

John J.P. Howley, Kaye Scholer LLP, New York, New York, for Amicus Curiae Government of the United Kingdom of Great Britain and Northern Ireland.

Before: SILER, DAUGHTREY, and COLE, Circuit Judges.

**\*664** COLE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. SILER, J., (pp. 688-92), delivered a separate dissenting opinion.

## OPINION

COLE, Circuit Judge.

Kenneth T. Richey was arrested, convicted, and sentenced to be executed for intentionally starting an apartment fire that killed two-year-old Cynthia Collins. He continues to maintain his innocence. Following a series of unsuccessful appeals in the Ohio state courts, Richey petitioned the district court for a writ of habeas corpus, and the court denied his request. Richey now appeals this decision. Because constitutional errors have undermined our confidence in the reliability of Richey's conviction and sentence, we **REVERSE** the decision below.

## I. BACKGROUND

On June 30, 1986, at approximately 4:15 a.m., a fire started in the second-floor apartment of Hope Collins, who was elsewhere at the time. Her two-year-old daughter, Cynthia, was alone in the apartment, and she died in the fire. The Fire Chief initially blamed the fire on an electric fan, but then asked Assistant State Fire Marshal Robert Cryer to investigate further. Cryer arrived at the apartment at 6:30 a.m. and spent most of the day investigating. The next day, Cryer told the prosecutor's office that he believed that the fire had resulted from arson.

Cryer based his conclusion solely on his belief that some of the burn patterns he found at the apartment demonstrated the presence of accelerants. He found no empty containers of flammable liquids. From the apartment, Cryer took nothing that the Ohio Arson Crime Laboratory ("State Arson Lab") could test for the presence of accelerants, nor did he order the scene secured at the end of his June 30

investigation. Instead, Cryer authorized the building's owners to clean the apartment. The owners discarded the damaged living room carpet, which ended up at a local garbage dump.

The police investigation quickly focused on Richey. On the morning of June 30, within hours of the fire, he was interviewed by the police chief. On July 1, Richey was arrested for arson and gave a tape-recorded interview to the police, who were joined by Cryer and a prosecutor. Although acknowledging that he was intoxicated and therefore did not remember much of what happened early in the day on June 30, Richey denied starting the fire. Because gasoline and paint thinner were stored in an unlocked greenhouse across the street from the apartment building, the State theorized that Richey had obtained these materials from that greenhouse. However, the owner of the greenhouse was unable to determine whether any gasoline or paint thinner was missing, and Cryer took none of the accelerants from the greenhouse to compare with the materials at the fire scene.

On July 10, 1986, a grand jury charged Richey with: (1) aggravated felony murder; (2) aggravated arson; (3) breaking and entering; (4) involuntary manslaughter during the commission of a felony; and (5) child endangerment. The court appointed two attorneys to defend Richey against the charges, to which he pled not guilty, not guilty by reason of insanity, and not competent to stand trial by reason of insanity. The trial court ordered Richey to undergo a psychiatric examination, and he eventually withdrew his insanity plea and was adjudged competent to stand trial. In late 1986, Richey waived his right to a trial by jury, and agreed to be tried before a three-judge panel, under Ohio Revised Code Section 2945.06. The heart of the indictment against Richey was the charge **\*665** of aggravated felony murder, which, if proven, made him eligible for the death penalty. According to the statute in effect at the time, an aggravated felony murderer must have "specifically intended to cause the death of the person killed[--]the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt." Ohio Rev. Code Ann. § 2903.01(D). The State concedes that it presented no evidence that Richey specifically intended to kill Cynthia Collins. Rather, the State hypothesized that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

Richey set fire to the Collins apartment so that he could kill his ex-lover, Candy Barchet, and her new boyfriend, Mike Nichols, who were spending the night together in the apartment below. The testimony at trial established that Barchet moved into the building on June 15, and that within a few days she and Richey progressed to a sexual relationship. Apparently, Richey frequently told Barchet that he loved her and would kill any other men she dated. John Butler testified that on June 24, he had sex with Barchet, and that when Richey learned of this encounter, he confronted Butler while carrying a knife. Right after the confrontation, Richey broke his hand by punching a door.

On June 29, Richey attended a party hosted by Peggy Villarreal, who lived next door to Hope Collins. Barchet brought Nichols to the party, kissed him in plain view of the other guests, told Richey that she wanted to date Nichols, and later took Nichols home with her. Several witnesses testified that Richey--who was intoxicated that night--became upset upon learning of Barchet's new boyfriend. One witness testified that Richey proclaimed that "[i]f I can't have [Barchet], nobody else can." Three other witnesses testified that Richey told them that Building A, the subsection in which Barchet resided, "was going to burn" that night.

Hope Collins testified that around 2:00 a.m., as the party began to wane, Richey asked her if he could sleep on her sofa that night, but she refused. Collins testified that Richey offered to steal some flowers for her from the greenhouse located across the street, but she declined his gesture. Shortly after 3:00 a.m., a friend of Collins drove up to the building and asked Collins to go out with him that night. Collins told him that she did not have a babysitter. According to Collins, Richey volunteered to "keep an eye" on Cynthia, as long as he could sleep on Collins's couch. Collins testified that at 3:30 a.m., with Cynthia in Richey's care, she went out with her friend.

The fire started at about 4:15 a.m. Five eyewitnesses testified that after Richey emerged onto the scene: (1) he repeatedly hollered that "[t]here's a baby in the house"; (2) he repeatedly attempted to enter the burning apartment building to

save Cynthia's life; (3) he proceeded so far into the building that "he came back out coughing and spitting up"; and (4) and police eventually had to restrain him from entering the building. The Assistant Fire Chief stated that Richey's efforts to save Cynthia "constituted that of a person who completely was disregarding his own safety." Conversely, another tenant testified that upon viewing the fire, Richey boasted that "[i]t looks like I did a helluva good job, don't it."

As part of its investigation, the State eventually retrieved six samples of debris remaining from the fire. Several of those samples came from the carpet that had first found its way into the garbage dump. On the afternoon of July 1, nearly two days after the fire broke out, the Deputy Sheriff retrieved the carpet from the dump. One piece of carpet was recovered from atop the garbage pile, and another was partially covered by trash. Once removed, *666 the carpet was placed in the sheriff's parking lot. The carpet stayed in the parking lot--located no more than forty feet away from gasoline pumps--for three weeks, before it was finally taken to the State Arson Lab for testing. Similarly, a wood chip sample was not removed from Collins's apartment for testing until July 17, nearly three weeks after the fire.

These samples were analyzed by the State Arson Lab using gas chromatograms, which one of the State's forensic chemists, Dan Gelfius, described at trial as "scientific instrumentation that allows the differential migration of the components of hydrocarbons to separate and to give ... a pattern similar to the identification of fingerprints." Basing his conclusions on a method of analyzing the chromatograms that has neither been published nor peer-reviewed, Gelfius testified that both a sample of carpet from Collins's living room and a sample of wood from her balcony contained paint thinner, and that another sample of the living room carpet contained gasoline. The State detected no traces of accelerants on the other three samples from the apartment, the clothing and boots that Richey wore on June 29, or the bandage that covered his broken hand.

Gelfius was unaware of the carpet's removal to the local garbage dump and then to the sheriff's parking lot until he arrived to testify at trial. He has since

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

acknowledged that, had he known about these detours, he would have been "very concerned" and "probably work wouldn't have been done on this case." The missing links in the carpet's chain of custody did not disturb Assistant State Fire Marshal Cryer, because he believed that the same paint thinner was found on both the living room carpet and the balcony. However, this turned out to be false: the Chief of the State Arson Lab, Mohammed Gohar, and Gelfius have since acknowledged that the State Arson Lab did not--and would not have even been able to--"match" the paint thinner purportedly found on the deck to the paint thinner purportedly found on the carpet.

Yet the State's scientific evidence went unchallenged at trial. Richey's forensic expert for the trial was L. Gregory DuBois of the firm CTL Engineering. Richey's trial counsel acknowledged that DuBois "was not recommended by any civil defense attorney or any other attorney." Instead, trial counsel learned about DuBois's firm through an advertisement that he received in the mail. Trial counsel stated that he "called CTL because they advertised [that] they had experts in arson investigation, and [DuBois] was the one [that CTL] sent up." CTL sent DuBois, whose formal education was limited to a bachelor's degree in metallurgical engineering and a partially completed stint in business school. Although accredited in Ohio as an accident reconstructionist, he primarily performed "vehicle accident reconstructions." He had no accreditations in arson or fire investigations. Moreover, although DuBois was a member of the American Society for Testing Materials, the membership was solely through CTL; DuBois had no individual membership in the group, and he had attended no "seminars or other educational venues sponsored by the ASTM." Similarly, although DuBois was a member of the International Association of Arson Investigators ("IAAI"), his involvement was limited to receiving quarterly publications in the mail, and at the time he was hired by Richey's trial counsel, he had attended no IAAI seminars on fire investigation. Finally, although DuBois had participated in numerous arson investigations with CTL, he did so in a supporting role: "[t]ypically, [he] would review the results [of the investigations] with the chemist who performed the analyses."

*667 DuBois's resume, which trial counsel had received, indicated that he worked as a metallurgical engineer, and that his arson-related training consisted of only two two-day courses, neither of which involved the subject of burn patterns. Both courses were taught by personnel from the State Arson Lab, whose inculpatory conclusions DuBois was hired to review. Moreover, DuBois admitted that he admired Mohamed Gohar--Chief of the State Arson Lab, who oversaw the testing in Richey's case--and he believed that Gohar stayed at the forefront of technology and was "quite authoritative in his field." At the time he was hired, DuBois believed that the state fire marshal's office did a better job of fire sample analysis than his own employer did.

Although Richey's trial counsel had been appointed on July 14, 1986, and received the State Arson Lab reports on August 5, 1986, he did not meet with DuBois (or any other potential expert) until September 11, 1986. At that meeting, according to DuBois, trial counsel told him that "he was interested in keeping costs to a minimum, .... and he told [DuBois] that he wanted about ten hours in the initial investigation." Trial counsel did not ask DuBois what type of work was necessary to investigate the fire; according to DuBois, "the ten hours was given to me by [trial counsel] as an implied budget, that this was what he could afford in this particular case to have the time spent, and he wanted to know what could I do for ten hours worth of time." It was not until November 18, 1986 that trial counsel contacted DuBois again, and in the interim DuBois did no further work on the case. By this point, despite having had no idea what conclusions DuBois would draw, trial counsel had already put his name on the witness list.

When his investigation finally began, DuBois contacted Gohar. The two "work [ed] together, went through each chromatogram, and [DuBois] had [Gohar] show [him] which standard he used and what result he got, and which sample matched which chromatogram." DuBois conducted no independent testing of the samples, nor did he interview Cryer or otherwise attempt to analyze the growth and spread of the fire. Trial counsel, however, "wasn't aware that [DuBois] had not done any [independent testing] until well after the trial." Although trial counsel never asked DuBois to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

Page 7

perform any independent testing, he "assumed [DuBois] would do more than just look at [the] reports of Cryer." Furthermore, when DuBois presented his findings to trial counsel, counsel did not ask him what his basis was for those findings. DuBois, who submitted no written report to trial counsel, confirmed that counsel "was surprisingly nonargumentative with me [and] didn't challenge me on what I thought or why I thought what I did or anything." Nor did DuBois recall counsel ever asking him about any problems with the State's evidence.

Rather, admitted trial counsel, "once [DuBois] confirmed that everything Cryer had done was accurate and appeared to be in order, we decided at that point not to use him." Reading between the lines, the State then subpoenaed DuBois to testify *against* Richey. DuBois contacted trial counsel and asked for his help in resisting the subpoena, but he received none. According to DuBois, he was told by Richey's counsel that "I'll [DuBois] just have to do what I have to do." Consequently, Richey's sole forensic expert testified at Richey's trial against him, acknowledging that he found nothing wrong with the State's conclusions. Trial counsel neither cross-examined DuBois nor presented any other scientific evidence.

When informed, following trial, about the full extent to which the carpet had *668 been diverted prior to arriving at the State Arson Lab, DuBois responded that "I don't think [that counsel] told me the entire sequence of events involving the carpeting after the fire and before trial." When asked whether this information would have affected his acquiescence to the State's scientific conclusions, DuBois remarked that:

I don't know if I knew that at the time I did this investigation. And it raises a problem with spoilation of this evidence. I'm having trouble right now telling you whether or not that changes my opinion or affects it.
I'm looking--I looked at this fire and I looked at a lot of things together in reaching my conclusion about this fire. And if you take out a piece of this puzzle, then I would have to re-evaluate what's left about this fire.

The panel found Richey guilty on all counts (except involuntary manslaughter, which was a

lesser alternative to aggravated felony murder), including aggravated felony-murder. At the death penalty sentencing hearing, Richey presented an array of evidence about his background and upbringing. He had received his first mental evaluation at age thirteen, and had been repeatedly treated at mental institutions. A psychologist testified that Richey suffers from a borderline personality disorder and antisocial personality disorder, and that he functions at the emotional level of a ten- or eleven-year-old. A social worker testified that Richey suffers from "histrionic behavior disorder."

The panel unanimously sentenced Richey to death. It concluded that "Richey purposely and with specific intent caused the death of Cynthia Collins" and disagreed that mitigation was warranted by Richey's attempt to save her. Instead, the panel opined that "[t]his final contention of the defendant was immediately disposed of when placed in juxtaposition to the unrefuted evidence that the defendant pulled the fire alarm from the hall prior to torching the decedent's apartment and effectively eliminated the chance that Cynthia Collins would awaken and escape her own demise."

The "unrefuted" evidence supporting the panel's conclusion that Richey had pulled the fire alarm--which even the State did not argue--was the testimony of Cryer, who noted that he saw the smoke detector hanging from the ceiling by its wires, eight inches below the ceiling, when he arrived at the apartment the morning after the fire. (At trial, Hope Collins testified to her belief that the smoke detector had been connected and functioning in the hours prior to the fire.)

On direct appeal, Richey was represented by counsel from the Ohio Public Defender Commission. After he reviewed the trial record, appellate counsel discussed the appealable issues with his supervisor, and expressed his view that trial counsel's "representation of Mr. Richey had been markedly deficient and that the deficiencies had severely prejudiced Mr. Richey's defense." According to appellate counsel:

[My supervisor], who is a personal friend of [trial counsel], listened to my views regarding the prejudicial deficiencies of [trial counsel's] representation of Mr. Richey, and responded by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

saying that I should do the best job I could without raising the ineffective assistance of trial counsel issues. [My supervisor] did not tell me that the ineffectiveness arguments I wanted to make lacked merit. He simply told me not to make them .... [he] left me with no doubt that if I were to push on the ineffective assistance of counsel issues, he would not be pleased and my job rating would suffer. This was not the first time [my supervisor] had directed me and others **669** in our office not to raise ineffectiveness issues in a brief. On an earlier occasion I had to sneak into the office after hours to put an ineffective assistance of counsel argument back in a direct appellate brief after [my supervisor] had taken it out.

Yet appellate counsel averred that "[t]he errors made by [trial counsel] were too egregious to be completely ignored. Therefore, I raised ineffective assistance of trial counsel as an appellate issue ... but did so in a relatively weak fashion so that I would not have too severe a confrontation with [my supervisor]. Furthermore, I did not raise many of the specific instances of trial counsel's ineffectiveness that I had noted in reviewing the record, and did not research what I regarded as other potentially meritorious ineffective assistance of counsel arguments."

The Ohio Court of Appeals affirmed Richey's conviction and sentence. *State v. Richey,* 1989 WL 156561 (Ohio Ct.App. Dec.28, 1989); *State v. Richey,* 1989 WL 156562 (Ohio Ct.App. Dec.28, 1989). By a vote of four to three, the Ohio Supreme Court affirmed. *State v. Richey,* 64 Ohio St.3d 353, 595 N.E.2d 915 (1992), *rehearing denied* 65 Ohio St.3d 1421, 598 N.E.2d 1172 (table). The U.S. Supreme Court denied certiorari. *Richey v. Ohio,* 507 U.S. 989, 113 S.Ct. 1592, 123 L.Ed.2d 157 (1993), *rehearing denied,* 508 U.S. 934, 113 S.Ct. 2401, 124 L.Ed.2d 303.

At this point Richey retained new counsel, who uncovered new evidence and retained new scientific experts. Counsel submitted an affidavit from Villearreal, who recanted her trial testimony, claiming that "I never heard Kenny Richey say anything about burning 'A Building' or about using Marine Corps tactics to burn the building. I don't recall exactly what I said at [Richey]'s trial, but if I said anything about [Richey] threatening to burn A

Building or about using Marine Corps tactics, I was wrong." Villearreal further averred that during and after the party, Richey "was at ease, having fun and enjoying himself. He was not angry about anything[, and] expressed no anger toward Candy Barchet, Mike Nichols or anybody else."

Villearreal also contended that Cynthia "was always into everything, including matches and lighters. Sometimes when Hope and I would be drinking coffee and smoking cigarettes, Cynthia would grab our lighters and run into her bedroom." Villearreal detailed a number of incidents in which Cynthia's action failed to comport with basic fire safety, including one in which Cynthia placed a lit cigarette between sofa cushions, and also averred that according to Hope, Cynthia had twice set fire to their beds, using, respectively, a curling iron and a cigarette lighter. Villearreal also declared that she ate dinner at Collins's apartment the night of the fire, and that the smoke alarm was "hanging loose." Indeed, noted Villearreal, "Hope's smoke detector was almost always unhooked. It was very sensitive and would go off when we were just smoking cigarettes or even when just the oven was on. So Hope used to keep it unhooked."

According to Villearreal, her knowledge of these circumstances was no mystery to either the prosecutor or Richey's trial counsel. Specifically, Villearreal averred that "before Richey's trial for arson and murder, [she] spoke to [his] lawyer ... about Cynthia Collins' playing with fire." Villearreal expressed surprise that during Richey's trial, "no one asked me any questions about Cynthia's playing with fire." As for the prosecutor, Villearreal stated that she "also spoke with the prosecuting attorney ... before [Richey]'s trial. I probably also told him about Cynthia's playing with fire but I don't specifically recall."

**670** Richey's new forensic experts both castigated the State's scientific conclusions and surmised that DuBois' accession to them amounted to professional incompetence. Richard Custer, a specialist in fire reconstruction, testified that--even in 1986, when the State tested the samples--Cryer's conclusions were based on "unsound scientific principles." First, Custer opined that the burn pattern could also have resulted from a fire that occurred naturally, and that Cryer's theory of the accelerant's pour pattern and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

location would have required the use of ten gallons of fuel. Second, Custer testified that the irregular burn patterns on the deck--which Cryer believed indicated that accelerants were used--were caused simply by intense radiation. Indeed, elaborated Custer, whether or not an accelerant had been used, the fire would have spread downward, and any evidence of accelerant in the gaps would have been destroyed by the fire itself. Third, Custer discounted Cryer's belief that accelerant use was evinced by the fire's speed, noting that rapidly spreading fires are common in residences with modern furnishings and room sizes. Finally, Custer dismissed Cryer's explanation for the state of the smoke detector--that it had been dislodged prior to the apartment's ignition--as speculative. Custer noted that the high temperature around the ceiling could easily have dislodged even a smoke detector that was mounted.

Custer concluded that the fire scene reflected an accidentally set fire that experienced "flashover"--a possible collateral consequence of the fire's radiated heat causing additional objects to combust. Custer produced three computer models detailing how the fire would have progressed had it spread accelerant-free, and determined that flashover would have occurred in the two most likely scenarios. Moreover, based on his knowledge of Hope Collins's smoking habits at the time, photographs that showed the presence of alcoholic beverages and smoking paraphernalia on the evening of the fire, and the fact that Collins and some of her friends had been using marijuana that evening, Custer concluded that the fire was likely caused by a carelessly discarded cigarette that had smoldered, for several hours, between the cushions of the living room couch.

Andrew Armstrong, Ph.D., a chemist and forensic scientist, echoed Custer's conclusions. Reviewing the State's raw data--and also applying what he believed to be contemporaneous scientific standards--Armstrong concluded that "there is no evidence of an identifiable ignitable liquid in any of the samples from the fire scene." The sample of wood obtained from the balcony revealed no paint thinner; the chromatogram from the sample did not "even look close" to the pattern associated with paint thinner, and instead revealed only turpentine, which occurs naturally in the type of wood used to

construct patios. The pattern purportedly revealing paint thinner in the carpet, opined Armstrong, did not conclusively indicate paint thinner, as it was also consistent with common household products such as furniture polish or insecticide. Moreover, although the State concluded that both of the aforementioned samples contained paint thinner, Armstrong testified that the two samples did not even reveal the same substance.

Armstrong also testified that the carpet sample which the State concluded contained gasoline lacked the "five peak component" pattern indicative of gasoline. Although acknowledging that the ASTM had yet to adopt the "five peak" standard in 1986, Armstrong testified that he and other experts employing gas chromatography knew of and relied upon the standard at that time. Noted Armstrong, "Many carpet samples that have been exposed to fire *671 conditions contain [the compounds identified by the State Arson Lab] in some concentration." Armstrong stressed that only the "five peak" standard can eliminate false positives, and that "the elimination of false positives is of utmost importance." To the extent that the carpet did reveal gasoline, elaborated Armstrong, it would have been gasoline that had evaporated, and it would have been impossible to determine when the gasoline had reached the carpet. Armstrong agreed that the carpet could have absorbed gasoline from the parking lot--which, recall, was located near gasoline pumps--on which the carpet had rested for three weeks. Finally, Armstrong touched on a broader problem with the State's methodology that undermined its conclusions: no control samples had been compared with the tainted ones.

In April 1994, Richey moved to reopen his appeal, arguing that he lacked the effective assistance of appellate counsel. His motion was denied by the court of appeals, which was affirmed by the Ohio Supreme Court. See State v. Richey, 73 Ohio St.3d 523, 653 N.E.2d 344 (1995). Richey's petition for postconviction relief was denied by the trial and appellate courts, State v. Richey, 1997 WL 722782 (Ohio Ct.App. Nov. 18, 1997), and denied review by the Ohio Supreme Court, State v. Richey, 81 Ohio St.3d 1467, 690 N.E.2d 1287 (Ohio Mar. 11, 1998) (table). Richey's second state postconviction petition was similarly denied by the trial and appellate courts, State v. Richey, 2000 WL 681642

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

(Ohio Ct.App. May 26, 2000), and further review was again denied by the Ohio Supreme Court, *State v. Richey*, 90 Ohio St.3d 1427, 736 N.E.2d 25 (Ohio Oct. 4, 2000) (table).

Advancing to federal district court, Richey filed a petition for a writ of habeas corpus, alleging that both his conviction and sentence were tainted by constitutional errors. The district court denied Richey's petition. Although it refused to conduct an evidentiary hearing, the district court cited, in defense of the State's forensic conclusions, an extra-record article written by forensic scientist Anthony Cafe. Cafe has subsequently averred that the district court "miscited and misunderstood my published articles" and that "most of the world's leading forensic scientists in this field would be horrified if they saw the chromatograms used to convict Kenny Richey." Cafe warned that "[i]f Kenny Richey were executed on the basis of this scientific evidence, then these chromatograms will become historical documents, examined by scientists all over the world and used to show just how wrong forensic evidence can be."

The district court certified for appellate review eight of Richey's grounds for relief. Richey timely appealed, and we added three claims to the certificate of appealability. Included in the certificate of appealability is the question of whether there was insufficient evidence to convict Richey of the crimes with which he was charged or tried, as well as whether he suffered ineffective assistance of counsel.

## II. ANALYSIS

We apply the familiar habeas rules. Because Richey's petition was filed after April 24, 1996, it falls under the restrictions imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). AEDPA requires that we respect any determination made by the state court unless it: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *67228 U.S.C. §§ 2254(d)(1)-(2); see also Williams v. Taylor*, 529 U.S. 362, 120

S.Ct. 1495, 146 L.Ed.2d 389 (2000). Within these constraints, we review the district court's legal conclusions *de novo*, but we may upset its factual determinations only if they were clearly erroneous. *Lott v. Coyle*, 261 F.3d 594, 606 (6th Cir.2001).

### A. Sufficiency of the Evidence

[1] The heart of the prosecution against Richey--and the basis for his death sentence--was that he committed aggravated felony murder, which is prohibited by Ohio Revised Code § 2903.01. Richey argues that to convict a person of aggravated felony murder under the statute, the State is required to prove that the defendant intended to kill the person who actually died (in this case, Cynthia Collins), but that here, the State introduced no evidence that Richey actually intended to kill Cynthia. The State disputes this argument on the merits, and also urges that the claim has been procedurally defaulted. Because a discussion of the procedural default in this case requires an understanding of the merits, we will discuss the merits of the claim first.

### 1. Merits

[2] The district court rejected Richey's statutory argument, ruling that "this claim is not cognizable in a federal habeas court as it is one touching purely on state law." In so holding, the district court misunderstood Richey's claim. According to *Fiore v. White*, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), the federal constitution's Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." *Id.* at 228-29, 121 S.Ct. 712. Therefore, the state law question regarding the elements of the crime predicates the enforcement of Richey's federal constitutional right. Thus, we must first look to state law to determine whether the State was required to prove, as an element of the crime, that Richey intended to kill the victim.

### a. Elements of Aggravated Felony Murder

At the time of the fire, the statute at issue provided:
 (B) No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

committing or attempting to commit ... aggravated arson or arson ....

* * *

(D) No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another.... If a jury in an aggravated murder case is instructed that a person who commits or attempts to commit any offense listed in division (B) of this section may be inferred ... to have intended to cause the death of any person who is killed during the commission of, attempt to commit, or flight from the commission of or attempt to commit the offense, the jury also shall be instructed that the inference is nonconclusive, that the inference may be considered in determining intent, that it is to consider all evidence introduced by the prosecution to indicate the person's intent and by the person to indicate his lack of intent in determining whether the person *specifically intended to cause the death of the person killed,* and that the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt.

O.R.C. § 2903.01(law effective prior to July 1996) (emphasis added).

Although subsection B, the felony murder section of the statute, mandates no **\*673** nexus between the specific intent of the arsonist and the identity of the victim, subsection D, which informs the intent required under subsection B, mandates that the jury be instructed to consider whether the defendant "specifically intended to cause the death of *the person* killed, and that the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt." O.R.C. § 2903.01(D) (emphasis added). The plain meaning is unmistakable: according to the statutory text, the defendant must have killed the person that he actually intended to kill.

Indeed, Ohio courts have interpreted subsection D of the statute in this exact way. In *State v. Maurer,* 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), the court upheld an aggravated felony murder conviction under subsection D because the judge instructed the jury that it had to find beyond a reasonable doubt that not only did the defendant kill the victim in the course of a felony (a kidnapping),

but also that "there was present in the mind of the defendant a specific intention to kill Dawn Marie Hendershot," the person whom the defendant was charged with killing. *Id.* at 779; *see State v. Brewer,* 1984 WL 6695 at \*3 (Ohio Ct.App. July 18, 1984) (affirming conviction where the jury was instructed to determine "whether defendant specifically intended to cause Tewksbury's death," where Tewksbury was the person killed); *State v. Grant,* 67 Ohio St.3d 465, 620 N.E.2d 50, 62 (1993) (upholding an aggravated felony murder conviction where the defendant "burn[ed] down an occupied home, known to contain children, in order to kill *the children* ") (emphasis added); *see also Clark v. Jago,* 676 F.2d 1099, 1102 (6th Cir.1982) ("Ohio has left the company of those jurisdictions which have traditional 'felony murder' offenses.... [u]nder Ohio law ... purpose to kill is an essential element of the crime of aggravated murder."). [FN1]

> FN1. It is noteworthy that Ohio also has a separate felony murder statute under which defendants are not eligible for a death penalty specification. *See* Ohio Rev. Code Ann. § 2903.02(B). Richey was not convicted under this statute.

The State argues, however, that subsection D has no bearing on the elements of aggravated felony murder, and "does not require the State to do anything--it concerns jury instructions." This argument is curious, to say the least. First, it is clear from the statute and case law that the State is required to do something: it is required to prove the element of specific intent. Second, there is no meaningful difference between requiring the State to do something and requiring that the jury be informed that the State is required to do something. While the second formulation requires more words to articulate, its practical effect is identical. Nor is it fathomable, as the State suggests, that Ohio's General Assembly intended to require specific intent when the defendant was tried by a jury, but not when the defendant was tried by a panel of judges. Such a reading would mean that the elements of the crime can change depending upon who the fact-finder is. [FN2] Because such a dichotomy would be unconstitutionally irrational, we are unable to embrace the State's interpretation. *See I.N.S. v. St. Cyr,* 533 U.S. 289, 299-300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (noting that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

Page 12

statutes should be interpreted to avoid unconstitutional results). Consequently, in order to convict a *674 defendant of the crime of aggravated felony murder in Ohio, the State must prove that the defendant specifically intended to kill the victim.

> FN2. Richey correctly argues that were there truly a distinction in Ohio law between the elements that must be proven before a jury and those that must be proven before a panel of judges, trial counsel would have been obviously ineffective in advising Richey to bypass a jury, and with it the extra element that the State could not satisfy.

Not only does subsection D provide for the specific intent requirement, it provides for the one way that the State can more easily satisfy this requirement. The statute creates the possibility of a permissive inference by a jury, whereby the jury can infer from the circumstances of the felony, that the defendant intended to cause the death of the person actually killed. Ohio Rev. Code Ann. § 2903.01(D). The statute makes clear, however, that this inference is not conclusive, and that the jury must consider all the evidence on both sides, including any evidence presented by the defendant "to indicate his lack of intent in determining whether the [defendant] specifically intended to cause the death of the person killed..." *Id.* Although the statute details a less onerous means by which the State can prove the specific intent of a defendant to kill the actual victim, even in this circumstance, the statute does not change the substance of what the State must prove: that the defendant intended to kill the very person who actually died. *See State v. Brewer,* 1984 WL 6695, at *3 (Ohio Ct.App.).

**b. Transferred Intent**

In Richey's case, the State presented no evidence that he specifically intended to kill Cynthia Collins, and in fact conceded this point during oral argument before the state court. Instead, the State presented evidence that Richey had a motive to kill Candy Barchet and/or Mike Nichols, and thus, the State assumed that the doctrine of transferred intent could be used to find that Richey specifically intended to kill Cynthia. [FN3]

> FN3. The State relied solely on this theory of transferred intent to meet its statutory burden, and this approach in Richey's case dates back to the Bill of Particulars, where its stated, regarding Count One of the indictment that, "[t]he purpose to cause the death of another, to-wit: Cynthia Collins arises from the intent of the Defendant to cause the death of Candy Barchet and/or Mike Nichols."

Because nothing in the language of O.R.C. § 2903.01 supports the idea that the Ohio General Assembly affirmatively intended for transferred intent to apply to aggravated felony murder, the State's sole argument would be that the doctrine of transferred intent, derived from the common law, applies to all intent crimes. However, the plain text of O.R.C. § 2903.01(D) indicates that the statute not only fails to affirmatively permit transferred intent, it actually precludes it.

First, as previously stated, subsection D already specifies the single way in which the State is permitted to utilize a more flexible approach to proving specific intent: the permissible inference. Thus it would be overreaching for this Court to read into the statute another flexible approach, such as transferred intent. Second, as a general rule of statutory construction, every word has a meaning, and the courts should not render statutory language superfluous. *Hibbs v. Winn,* --- U.S. ----, 124 S.Ct. 2276, 2286, 159 L.Ed.2d 172 (2004); *D.A.B.E., Inc. v. Toledo-Lucas County Bd. of Health,* 96 Ohio St.3d 250, 773 N.E.2d 536, 543 (2002). In this case, the State urges us to construe the phrase "intended to cause the death of the person killed" to mean "intended to cause the death of another." The difference in meaning is profound, and it is worth noting that the Ohio General Assembly has actually used the phrase "death of another" in another statute: its traditional felony murder statute. *See* Ohio Rev. Code Ann. § 2903.02(B) (stating that "[n]o person shall cause the death of another as a proximate result of *675 the offender's committing or attempting to commit an offence of violence that is a felony"). The fact that similar language was not used in this statute appears purposeful, suggesting that Ohio chose to use a heightened intent requirement here, to make aggravated felony murder deserving of the death penalty.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

Page 13

[3][4] Fortunately, we need not go so far as to interpret Ohio's statutory language to determine whether the law permitted transferred intent in aggravated felony murder cases. The Ohio courts themselves offered insight on this issue. At the outset, the assumption that the doctrine of transferred intent broadly overlays all intent crimes is incorrect. "Ohio courts have noted that the state legislature is aware of the doctrine of transferred intent at times applying the doctrine and other times refusing to apply the doctrine to a statute." *In re A.C.T.,* 158 Ohio App.3d 473, 816 N.E.2d 1098, 1100 (2004). Although there have not been many judicial pronouncements on the narrow issue of applying transferred intent to aggravated felony murder, all the cases that directly touch upon it suggest that the doctrine is inapplicable here. In *State v. Sowell,* 39 Ohio St.3d 322, 530 N.E.2d 1294 (1988), the defendant relied on Ohio Rev. Code Ann. § 2903.1(D) to argue that transferred intent could not support his conviction for aggravated (non-felony) murder under § 2903.1(A). In rejecting his argument, the Ohio Supreme Court drew a distinction between the two subsections' treatment of transferred intent, such that subsection D could not be read to vitiate the incorporation of transferred intent in subsection A. *See id.* at 1305. In so doing, the court explicitly limited its application of transferred intent to cases of aggravated murder, not aggravated felony murder. *See id.* This suggests that the doctrine of transferred intent did not apply to subsection D, and at the very least, makes clear that the doctrine of transferred intent is not so over-arching as to be automatically applicable in proving all intent crimes. One Ohio court has gone further to state that:

> The doctrine [of transferred intent] has been applied for many years in Ohio but has apparently been removed by the legislature from application in aggravated murder cases. In revising R.C. 2903.01(D), the legislature [enacted the text at issue]... The legislature did *not* remove the doctrine of transferred intent from application in determining the absence or presence of purpose to kill in murder, as opposed to aggravated murder, convictions. The limitation of the legislative reference to aggravated murder implies to a point that the legislature intended for the doctrine of transferred intent to have applicability in situations involving lesser crimes such as

murder.

*State v. Mullins,* 76 Ohio App.3d 633, 602 N.E.2d 769, 771 (1992) (upholding a murder conviction based on transferred intent where the defendant, though was initially indicted on a charge of aggravated murder, was actually found guilty by the jury on a charge of non-aggravated murder). [FN4] The preceding state case law--and it is the only Ohio case law at the time that squarely addressed this issue--indicates that transferred intent does not apply to subsection D of the aggravated felony murder statute. Accordingly, in determining what the required elements of aggravated felony murder were under Ohio Rev. Code Ann. *676 § 2903.1, we are compelled to adhere to Ohio's specific pronouncements at the time of Richey's conviction and state appeals. Therefore, because the State chose to prosecute Richey for aggravated felony murder (subsection B and D) of the statute, rather than straight aggravated murder (subsection A), the State had to prove, as an element of the crime, that Richey intended to kill Cynthia Collins.

> FN4. The court's statement was quite broad, seeming not to make the distinction between aggravated murder and aggravated felony murder that the *Sowell* Court did. However, this distinction was not relevant for the *Mullins* Court's decision because it focused primarily on the difference between murder and aggravated murder.

The State does not address the aforementioned case law head-on. Instead, the State claims that the case law was addressed and disposed of by the Ohio Supreme Court. Thus, the State turns a blind eye to the status of the law at the time of Richey's conviction and the filing of his appeal; [FN5] it instead relies on the Ohio Supreme Court's pronouncement in Richey's case to support its interpretation of what elements it needed to prove.

> FN5. In affirmative support of its position, the State does point to *State v. Phillips,* 74 Ohio St.3d 72, 656 N.E.2d 643 (1995), and *State v. Coleman,* 37 Ohio St.3d 286, 525 N.E.2d 792 (1988) to show that subsection D is only applicable when a judge instructs a jury, and that therefore in Richey's case, where there was no jury,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

Page 14

transferred intent was applicable. These cases do not support the State's proposition. In *Phillips,* the issue was whether the jury received proper instructions in an aggravated felony murder case. The defendant claimed that the jury should have been instructed that any inference that it made regarding specific intent was permissive, not conclusive. 656 N.E.2d at 668. The court determined that its more general instructions were sufficient, because the State never opted to use the permissive inference in subsection D, the jury was never told that it could make an inference, and therefore an instruction regarding the inference was unnecessary. *Id. Phillips* is not about transferred intent, and it simply does not speak to whether transferred intent can be used in aggravated felony murder cases. The same is true in *Coleman,* where the court determined that jury instructions comported with subsection D because they conveyed to the jury that any inference of specific intent that was drawn from the nature of the crime was nonconclusive. 525 N.E.2d at 796. The cases cited by the State do not impact the decision before us in any way, they simply expound upon the permissive inference in subsection D, which neither party even suggests was used in Richey's case.

First, it is unclear if the issue of transferred intent as applied to subsection D of the statute was truly decided by the Ohio Supreme Court. The State points to a portion of the court's opinion entitled "Sufficiency of the Evidence," where the Ohio Supreme Court explains why there was sufficient proof that Richey was the arsonist. *State v. Richey,* 64 Ohio St.3d 353, 595 N.E.2d 915, 924 (1992). Although this section addressed many issues, the court stated that, "The fact that the intended victim escaped harm, and that an innocent child, Cynthia Collins, was killed instead, does not alter Richey's legal and moral responsibility." *Id.* at 925. The court then proclaimed that "transferred intent is firmly rooted in Ohio law." Critically, it cited only cases addressing subsection A of the statute-cases dealing with aggravated murder and not aggravated

felony murder, for which Richey was convicted.

However, even assuming that the Ohio Supreme Court's brief statement in Richey's case was meant to interpret the aggravated felony murder statute, [FN6] that court, although it has the ultimate authority in interpreting state law, would have been offering a novel, or at least unforeseen, interpretation of the statute. Prior to the holding in Richey's case, both the text of the statute and its treatment by the Ohio courts strongly indicated that transferred intent could not be applied to aggravated felony murder. We have not found a single Ohio case where transferred intent was applied and upheld where the \*677 defendant was charged with aggravated felony murder, whereas the language in *Sowell* and *Mullins* suggests the contrary. Thus, under the State's interpretation of the Ohio Supreme Court's opinion, the court would have been expanding what at the time was the known scope of the statute, raising what the United States Supreme Court has described as a most serious due process concern: "that a statute precise on its face has been unforeseeably and retroactively expanded by judicial construction." *Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

> FN6. It should be noted that we certified the statutory question regarding transferred intent to the Ohio Supreme Court, which declined to answer this question.

It is well settled that the government cannot establish the sufficiency of the evidence by resorting to an unforeseeable judicial construction of a criminal statute. The Supreme Court in *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), [FN7] stated what it deemed to be the three manifestations of the fair warning requirement:

> FN7. The *Lanier* Court noted that in order to satisfy the fair warning requirement, there need not be a court pronouncement applying the rule in a case with facts "fundamentally similar" to the one at bar. 520 U.S. at 268, 117 S.Ct. 1219. However, in Richey's case, although there was certainly no Ohio case definitively reading transferred intent into subsection

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D, there were strong indications that it was to be read out of subsection D.

First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second ... the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

*Id.* at 266, 117 S.Ct. 1219 (internal citations and quotations omitted). *See Gall v. Parker,* 231 F.3d 265, 305-06 (6th Cir.2001) (granting writ of habeas corpus upon holding that elimination of an element of a crime, or altering the necessary proof by the state supreme court violated Due Process Clause when both the plain text of the statute and prior state court decisions instructed otherwise); *see also Rabe v. Washington,* 405 U.S. 313, 316, 92 S.Ct. 993, 31 L.Ed.2d 258 (1972) (reversing as violative of the Due Process Clause a state law conviction that rested on unforeseeable judicial interpretation of a criminal statute).

[5] Accordingly, if the Ohio Supreme Court deliberated on, and decided the issue presented before us now, it would have been a novel interpretation of the statute, because the plain meaning and the court pronouncements in *Sowell* and *Mullins* indicated the opposite of what the State now urges. Prior to Richey's appeal before the Ohio Supreme Court, an Ohio appeals court (*Mullins* ) actually cited to subsection D of the aggravated felony murder statute as an example of an instance where the Ohio General Assembly read *out* of a statute the transferred intent doctrine. Furthermore, to the extent that the statute is ambiguous, the rule of lenity ensures that the requirement of fair warning is met by resolving doubts in favor of the defendant. *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). Although the Ohio Supreme Court is the ultimate

arbiter of the State's laws, the fact that the law prior to Richey's final *678 state appeal points to an interpretation of the statute without transferred intent raises serious due process concerns of retroactivity and notice. It must be said that this Court cannot decide what Ohio law should be, and that the Ohio Supreme Court could certainly decide that transferred intent was meant to apply to subsection D of the statute, were its decision to be made in a vacuum. However, because there was not a single judicial pronouncement suggesting that transferred intent could be used under subsection D, and because the prior case law affirmatively indicates to the contrary, the Ohio Supreme Court would have raised a federal constitutional concern of impermissible retroactivity, had it authoritatively read transferred intent into subsection D. Therefore, if we accept the State's interpretation of the Ohio Supreme Court's opinion as having done this, it would have been a retroactive or novel application of a statute which would have violated Richey's clearly established rights under the Due Process Clause.

The State could point to no Ohio law, prior to Richey's own case, that stands for the proposition that transferred intent applies in aggravated felony murder cases. Thus, in compliance with Ohio law, we must find that the State could not apply transferred intent in order to satisfy the specific intent requirement in an aggravated felony murder case. Whether or not the Ohio Supreme Court reached the issue of transferred intent as applied to subsection D, the State did not meet its burden of proving all the required elements of aggravated felony murder. Based on the state of the law at the time of his actions, the only way that Richey could have been constitutionally convicted of aggravated felony murder would have been upon a showing that Richey intended to kill the person that actually died. Because it is undisputed that there was no evidence to this effect, Richey's conviction necessarily lacked the support of sufficient evidence.

## 2. Procedural Default

[6][7] Aside from the merits, the State argues that Richey has defaulted this claim because he failed to press this argument during his direct appeal. "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Richey concedes that he did not raise the claim at trial or on direct appeal, as he was required to by Ohio rules.

[8][9] The first problem with the State's argument that the claim was defaulted is the question whether the state courts actually relied on an independent ground to deny Richey relief on this claim. The ground is independent "only if the state court rendering judgment in the case clearly and expressly stated that its judgment rests on a procedural bar." *Simpson v. Sparkman,* 94 F.3d 199, 202 (6th Cir.1996). In other words, a lapsed claim survives if the state court overlooked the default and decided the claim anyway. *See Warden v. Hayden,* 387 U.S. 294, 297 n. 3, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Thus, if, as the State contends, the Ohio Supreme Court did decide Richey's claim regarding transferred intent, this Court is free to review the claim without concern regarding the procedural bar. While we express doubt regarding whether the Ohio Supreme Court truly considered transferred intent as applied to subsection D of the statute, it is clear that the Ohio Supreme Court considered the issue of transferred intent generally with regards to *679 Richey's case. The court stated that "the culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the actual victim." *Richey,* 595 N.E.2d at 925 (internal quotations omitted). Moreover, at no point did the Ohio Supreme Court hold, or even intimate, that Richey had forfeited the chance to contest the sufficiency of the evidence supporting his conviction. Because the United States Supreme Court requires a " 'plain statement' that a [state court] decision rests upon an adequate an independent state ground[ ]," *Michigan v. Long,* 463 U.S. 1032, 1042, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), we must interpret this ambiguity to mean that the Ohio Supreme Court reached the issue of transferred intent. Therefore, there was no independent state ground barring our

review.

[10][11] Additionally, Richey argues that the ineffective assistance of his trial and appellate counsel supplies the cause needed to excuse his procedural default. Indeed, "[i]neffective assistance of counsel can supply the cause that, together with prejudice, would excuse a procedural default." *McFarland v. Yukins,* 356 F.3d 688, 699 (6th Cir.2004). To demonstrate cause for the procedural default, Richey must show that both his trial and appellate counsel were ineffective. He must demonstrate that trial counsel was ineffective for failing to challenge the sufficiency of the evidence, and he must establish that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to challenge the sufficiency of the evidence. Whether appellate counsel was ineffective for failing to raise the ineffectiveness of trial counsel (predicated on trial counsel's failure to challenge the sufficiency of the evidence) turns, of course, on whether appellate counsel would have been ineffective, absent the default below, for failing to challenge the sufficiency of the evidence. To convince us that his counsel was ineffective, Richey must demonstrate that: (1) counsel's performance was deficient; and (2) that the deficiency produced prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

[12][13] Richey encounters a threshold hurdle in asserting the ineffectiveness of his appellate counsel: he may not rely on ineffective assistance as cause to excuse the procedural default of his transferred intent/sufficiency of the evidence claim, if the ineffectiveness assistance claim is itself procedurally defaulted. Ohio Rule of Appellate Procedure 26(B) provides that "[a] defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel. An application for reopening shall be filed ... within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." Richey's motion to reopen his appeal in the Ohio courts--in which he asserted that his appellate counsel was deficient--was untimely, and the Ohio Supreme Court denied the motion as untimely. *See Richey,* 653 N.E.2d at 345. The question remains,

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

however, whether the rule was an "adequate" basis to preclude federal relief. "[A] rule is adequate if it is regularly or consistently applied by the state court[.]" *White v. Schotten,* 201 F.3d 743, 751 (6th Cir.2000). Richey argues that the rule does not fall within this criterion because it provides no definition of what constitutes "good cause" for an untimely filing and because the Ohio courts had neither articulated meaningful standards nor consistently applied any type of criteria.

The district court below held that Richey had not defaulted his ineffective assistance claim because "certainly as of the **680 date [that] Richey filed his Rule 26(B) application, the 'good cause' rule had not yet been applied with the regularity necessary to constitute an adequate and independent state procedural rule." *See also Anderson v. Attorney General,* 342 F.3d 1140 (10th Cir.2003) ("[S]tate procedural rules that bar ineffective assistance of counsel claims are further reviewed with a healthy degree of skepticism.") (internal quotations omitted); *Page v. Frank,* 343 F.3d 901, 909 (7th Cir.2003) (same).

We agree with the district court below. We measure whether Rule 26(B) was "firmly established and regularly followed by the time as of which it [was] to be applied." *Ford v. Georgia,* 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (quotations omitted). Although we did not decide this question directly in *White,* we did observe that "the state courts have not achieved consensus on what constitutes 'good cause' to excuse non-compliance with Rule 26(B)." *Id.* at 751. This was certainly true at, and even after, the time when Richey was required to file his motion to reopen under 26(B). *Cf. Mitchell v. Mason,* 325 F.3d 732, 739 (6th Cir.2003) ("[I]t is the Warden's burden to demonstrate that the rule was *already* firmly established and regularly followed as of the time the state court invoked the rule."). In some instances, the Ohio courts failed to excuse the most minor of violations caused by circumstances beyond the control of both the litigant and his lawyer. *See, e.g., State v. Winstead,* 74 Ohio St.3d 277, 658 N.E.2d 722 (1996) (finding no good cause for a filing that was one day late, and that had resulted "because the overnight courier that appellant's counsel had used failed to deliver the application before the deadline for filing expired"). In other

cases, the courts found good cause for significant violations even when no explanation whatsoever was provided by the litigant, solely because the litigant was proceeding *pro se. See, e.g., State v. Nitenson,* 1994 WL 69894 at *2 (Ohio Ct.App. Feb. 24, 1994) (finding good cause "in the interests of justice" even though "application was filed more than one year after we journalized our affirmation of his conviction and he gives no sworn statements whatsoever in his application"). Nor were these inconsistent cases outliers in an otherwise consistent application of 26(B). *Compare, e.g., State v. McCarter,* 1993 WL 107800 (Ohio Ct.App. Aug. 12, 1993); *State v. Klein,* No. 49260 (Ohio Ct.App. March 15, 1994); *with State v. Wright,* 1994 WL 398805 (Ohio Ct.App. July 29, 1994); *State v. Fields,* No. 95 CA-08-048 (Ohio Ct.App. April 21, 1994). Thus, we find that Richey's challenge to the effectiveness of his appellate counsel is preserved. [FN8]

FN8. Because we find that Rule 26(B) did not, in Richey's case, constitute an adequate state ground to deny his claims of ineffective assistance of appellate counsel, we do not reach the question whether ineffective assistance of appellate counsel could itself serve as the "cause" to excuse Richey's failure to comply with Rule 26(B). In *White v. Schotten,* 201 F.3d 743, 752-53 (6th Cir.2000), we held that the 26(B) proceedings constituted part of the direct appeal--during which a defendant is constitutionally entitled to counsel--such that ineffective assistance of appellate counsel could serve as cause to excuse noncompliance with Rule 26(B). Although our decision in *Lopez v. Wilson,* 355 F.3d 931, 937-38 (6th Cir.2004), cast doubt on whether *White's* holding would survive the more deferential standard of review required by AEDPA, *Lopez* has since been vacated and *en banc* review is still pending. *See Lopez v. Wilson,* 366 F.3d 430 (6th Cir.2004).

We now turn to the merits of Richey's ineffective assistance of counsel claim as an excuse for his procedural default. The deficiency of Richey's trial and appellate counsel stems from the same shortcoming: that they failed to grasp that the State

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

Page 18

did *681 not prove (and, indeed, had not even attempted to prove) that Richey specifically intended to cause the death of Cynthia Collins, as was required by the aggravated felony murder statute.

[14] The failure to understand the elements of the charged offenses and hold the State to proving those elements is among the most basic responsibilities of competent counsel. "At the least, defense counsel in a criminal case should understand the elements of the offenses with which his client is charged and should display some appreciation of the recognized defenses thereto." *Scarpa v. DuBois,* 38 F.3d 1, 10 (1st Cir.1994). The circumstances of Richey's case magnified counsel's obligation to understand the elements, because his conviction of aggravated felony murder subjected him not just to imprisonment, but to execution.

It would be one thing if counsel had failed to grasp a subtle question of statutory interpretation or had failed to raise an issue that would have been uncovered by only the most astute of jurists. However, as we explained above, at the time of Richey's trial and appeal--not the time of the Ohio Supreme Court's ruling--both the plain text of the Ohio Code and the judicial decisions interpreting it indicated that aggravated felony murder required specific intent, and that the doctrine of transferred intent was unavailable to the State. *See Prou v. United States,* 199 F.3d 37, 48 (1st Cir.1999) ( "Where, as here, an attorney fails to raise an important, obvious defense without any imaginable strategic or tactical reason for the omission, his performance falls below the standard of proficient representation that the Constitution demands."). Indeed, we have held that counsel can even be ineffective for failing to raise a legal claim that turns on an unresolved question of law, so long as counsel is aware that an unresolved issue exists. *See Combs v. Coyle,* 205 F.3d 269, 286 (6th Cir.2000) (resolving circuit split in defendant's favor, and then holding that counsel's failure to raise the objection was deficient because he "should have realized that the [practice at issue] was at least constitutionally suspect"--as a result, "[c]ounsel's failure to have objected at any point is inexplicable, and we can perceive no possible strategic reason for such a failure"); *see also United States v. Bass,* 310 F.3d 321, 327-30 (5th Cir.2002) (finding that appellate

counsel was ineffective for failing to challenge sufficiency on direct appeal when defendant's conduct fell outside the statute). It follows with even greater force that when both text and precedent compelled the conclusion, and the conclusion would have gutted, as a matter of law, the primary charge and death sentence, counsel was deficient for failing to raise it.

[15] Having established that both trial and appellate counsel were deficient, Richey must also demonstrate prejudice, a showing which is straightforward in this case. Because we have already determined that specific intent was clearly a requirement and the State failed to meet this requirement, Richey has demonstrated the necessary prejudice from the claimed violation of federal law. By failing to challenge the sufficiency of the evidence, trial counsel allowed the State to convict Richey and sentence him to death for a crime in which it had failed to satisfy one of the elements. Although the State may have been able to apply the doctrine of transferred intent for other crimes, such as felony manslaughter or perhaps even aggravated murder, the State chose to charge Richey with aggravated felony murder. At the time of the fire, the State could not convict someone of aggravated felony murder without proving that the defendant specifically intended to kill the person who was actually killed. Had Richey's *682 attorneys presented a proper challenge of the application of transferred intent to subsection D of the statute, Richey could not have been constitutionally convicted of aggravated felony murder, because the State did not prove Richey's specific intent to kill the victim. *Fiore v. White,* 531 U.S. 225, 228-29, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001). And by failing to raise this (and trial counsel's ineffectiveness) on appeal, appellate counsel again deprived Richey of dispositive relief. Richey was clearly prejudiced by his attorney's deficiencies. Thus, the procedural default of Richey's transferred intent/sufficiency claim is excused because of the ineffective assistance of both his trial and appellate counsel.

Because the Ohio Supreme Court considered the general claim regarding transferred intent, the state procedural rule did not constitute an independent, unreviewable state law ground; however, even if it did, the trial and appellate defaults were excused by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

cause (the result of ineffective assistance of trial and appellate counsel) and prejudice (inherent in the fact that we find the claim to be meritorious). In either case, Richey's claim was preserved for review.

## B. Ineffective Assistance of Counsel

[16] In a challenge that implicates his convictions on all charges, Richey also contends that his trial counsel was constitutionally ineffective in the way he handled his forensic expert and his failure to challenge the scientific evidence of arson. The State argues that this claim has been procedurally defaulted and disputes the claim on the merits.

## 1. Default

The State argues that this claim has been defaulted because Richey neglected to raise it on direct appeal. As the Ohio Supreme Court has explained, however, "[a]ny allegations of ineffectiveness based on facts not appearing in the [trial] record should be reviewed through the post conviction remedies." *State v. Coleman*, 85 Ohio St.3d 129, 707 N.E.2d 476, 483 (1999). *See also Byrd v. Collins*, 209 F.3d 486, 521 (6th Cir.2000). As our analysis below will illustrate in detail, Richey's claims regarding his counsel's ineffective handling of the scientific evidence depend almost entirely on evidence outside the trial record: namely, (1) the testimony of DuBois, who explained trial counsel's limited oversight, supervision, and engagement; (2) the testimony of trial counsel, which illustrated the process (or lack thereof) by which he decided to hire DuBois, as well as his oversight (or lack thereof) over the course of DuBois's scientific investigation; and (3) the testimony of Custer and Armstrong, who explained the type and quality of scientific analysis that a reasonably competent expert would have performed at the time of Richey's trial. Thus, Richey was prohibited from raising these claims on direct appeal.

Instead, Richey was required to raise the claims during his postconviction challenge. He did so. During the postconviction proceedings, Richey argued that he was "wrongfully convicted on the basis of false scientific testimony because trial counsel unreasonably relied upon DuBois, failed to conduct an adequate investigation for a competent expert and failed to call an expert to rebut the

State's false scientific testimony," and supported these claims with the statements of trial counsel, DuBois, Custer, and Armstrong. The state courts evaluated and decided the claim on the merits. *See Richey*, 1997 WL 722782 at *3. We therefore may do the same.

## 2. Merits

As previously noted, *Strickland* requires that Richey demonstrate both deficient performance and resulting prejudice.

## *683 a. Deficient Performance

In order to show deficient performance, a defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. A "court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.*

[17] At the outset, the State, and the dissent to this opinion, argue that Richey has no constitutional right to the "effective assistance of an expert." The district court also noted that it was not unreasonable for trial counsel to "decline [to conduct] further expert-shopping once that expert rendered his opinion." Both might be true if trial counsel had done everything he was supposed to have done, and--through no fault of trial counsel--the expert had simply come up short. *See Skaggs v. Parker*, 235 F.3d 261, 268 (6th Cir.2000) (defense expert's erratic and incoherent testimony during trial was not attributable to the failings of counsel given that the expert had been recommended by two colleagues and that counsel had used the expert before). But Richey argues, and the record reflects, that the failures of Richey's expert were largely caused by the failures of Richey's counsel. *See Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir.1997) ("[C]ounsel's failure to adequately prepare his expert and then present him as a trial witness [amounts to] constitutionally deficient

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.