395 F.3d 660                                                                 Page 20
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

performance."). As Richey's counsel observes, "[i]ncompetence cannot excuse incompetence."

First, trial counsel hired DuBois, based solely on a promotional flier that he happened to come across. DuBois was unqualified for the job because he worked primarily in another field, lacked training to do the job, and came into the litigation believing that the State's experts were more reliable than he was. Moreover, the minimal training he had received came from the very people whose conclusions he was being hired to review. The dissent notes that "There is no suggestion in the record that counsel was put on notice that DuBois was either incompetent or unqualified to serve as Richey's expert." However, we have held that the deficiencies of an expert can be imputed to counsel when counsel has *failed* to adequately research and screen an expert witness. *See Glenn v. Tate,* 71 F.3d 1204, 1210 n. 5 (6th Cir.1995) (finding deficient performance because "we are not prepared to assume that Drs. Ramani and Siddal would have been the experts retained by the defense ... if counsel had done their homework"). Thus, counsel owes more to his client than a passive duty to watch for red flags of incompetence.

Moreover, trial counsel waited two months after he was retained, and a full month after he received the State's scientific results, to contact and meet with DuBois. After their first meeting, he limited DuBois's initial investigation to ten hours--without any basis for doing so. *See Skaggs,* 235 F.3d at 270 (finding deficient handling of expert not excused "simply because counsel believed it would not be worth their time to request additional money from the court"); *Loyd v. Whitley,* 977 F.2d 149, 158 (5th Cir.1992) (finding deficient performance when counsel "wrongly assumed that funds were unavailable and he abandoned what he knew to be an important pursuit"). After DuBois's stunted investigation, counsel waited **\*684** another two months to meet with DuBois, who did no work in the interim.

Third, counsel failed to thoroughly inform DuBois about a critical problem with the State's scientific evidence--that the carpet had been housed in a garbage dump and on a parking lot located near gasoline pumps. *See Glenn,* 71 F.3d at 1210 ("[D]efense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant."); *see also Affinito v. Hendricks,* 366 F.3d 252, 260 (3d Cir.2004) ("When the key issue in a criminal case is whether the defendant suffered from a diminished capacity, we can think of nothing more critical than ensuring that the defense' psychiatric expert has as complete and accurate a description of the facts and circumstances surrounding the crime as possible.... [Failure to provide the expert with this information] was not a trial tactic, it was gross incompetence."); *Bloom,* 132 F.3d at 1273 (finding deficient performance when counsel possessed information that defendant had suffered extensive abuse as child, but counsel "failed to provide the information to Dr. Kling or to any other physician who examined [defendant]"). Although DuBois does not remember precisely what trial counsel told him, he did acknowledge that "I don't think [that counsel] told me the entire sequence of events involving the carpeting after the fire and before trial."

Fourth, trial counsel kept himself in the dark about all aspects of his expert's analysis. counsel had no idea that DuBois, rather than performing his scientific tests or even conducting his own analysis of the test results, was essentially being spoon-fed the results by Gohar (who was the chief of the State Arson lab). Only after the trial did counsel learn that DuBois performed no testing or independent analysis; counsel had never bothered to instruct or simply ask DuBois about the investigation and analysis he had hired him to perform. Moreover, counsel did not ask for a written report from DuBois explaining his conclusions, nor did counsel ask DuBois about the bases for his conclusions, or even if the State's conclusions suffered from any flaws or gaps. Despite DuBois's endorsement of the State's forensic findings--which seriously damaged Richey's case--counsel, in DuBois's words, "was surprisingly nonargumentative with me [and] didn't challenge me on what I thought or why I thought what I did or anything."

Even though trial counsel was not a scientist, this should not relieve him of his responsibility to understand the evidence being used to convict and execute his client. Furthermore, aside from the presentation of testimony from his own expert, he would have to be sufficiently informed to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

Page 21

cross-examine the State's experts. *See Dees v. Caspiri*, 904 F.2d 452, 455 (8th Cir.1990) ("[C]ounsel had a duty to garner the expertise necessary to cross examine [the State's expert].""). This responsibility was heightened here, given that the State called to the stand not only its own experts but also DuBois. *See Glenn*, 71 F.3d at 1210 ("We can only assume that defense counsel, not having done their homework, were not prepared to interrogate [their court-appointed experts] about the basis for the very damaging conclusions they stated."). That counsel was a lawyer, rather than scientist, should not have left him unable to comprehend even the basics of the science at issue. This is particularly so when the chain of custody, which is a legal issue, was critical to the reliability of the scientific evidence.

Fifth, trial counsel prematurely placed DuBois on his witness list and then failed to mitigate this mistake. Because trial counsel dragged his feet in hiring and **\*685** debriefing DuBois, he had to put DuBois on his witness list before he was aware how DuBois would testify. *See Skaggs*, 235 F.3d at 270 (rejecting time-pressure as excuse for counsel's performance when the time pressure was itself caused by counsel's "wait[ing] until the eleventh hour to prepare for the penalty phase and to line up a psychiatric expert to testify on [defendant's] behalf"). This became a problem, as once counsel decided against using DuBois, the State subpoenaed him to testify on its behalf. Nor, at this point, did counsel attempt to quash the subpoena or otherwise contest the testimony, or even cross-examine DuBois when he testified.

Finally, counsel failed to offer any competing scientific evidence. Of course, it is not always the case that "counsel must continue looking for experts just because the one he has consulted gave an unfavorable opinion." *Dees*, 904 F.2d at 454. However, the testimony of Custer and Armstrong makes it clear that, even in 1986, a reasonably diligent attorney would have found witnesses to attack the State's conclusions. And "[w]here there is substantial contradiction in a given area of expertise, it may be vital in affording effective representation to a defendant in a criminal case for counsel to elicit expert testimony rebutting the state's expert testimony." *Knott v. Mabry*, 671 F.2d 1208, 1213 (8th Cir.1982). Nor was this a case in

which counsel would have had to uncover an expert willing to spew junk science, because Armstrong and Custer both agreed that the scientific standards prevailing in 1986 would have seriously undermined the State's results, and both testified that they would have been available to apply such standards. *See Soffar v. Dretke*, 368 F.3d 441, 477 (5th Cir.2004) ("As was made evident during the state habeas proceedings, ... defense counsel would not have had to look far to find a ballistics expert who could have provided testimony to aid his defense.").

Instead, counsel adopted a defense that rendered Richey a sitting duck. Given the testimony of witnesses that Richey was upset at his ex-girlfriend and had made threatening comments, trial counsel's theory--that the fire was intentionally started by someone else--was doomed to fail. *See Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir.1993) (presentation of alibi defense did not excuse counsel's failure to investigate possibility that defendant in rape case was impotent, given that "[defendant's] alibi defense was vulnerable"--"[t]he vulnerability of the alibi defense shows the unreasonableness of the attorney's failure to investigate further and present the impotency defense"). And even if counsel had reasonably believed that this defense had merit, he could not have made an informed choice without reasonably investigating the alternatives. *See Soffar*, 368 F.3d at 474 ("[A]n actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results.").

Trial counsel's failure to screen, supervise, or engage DuBois left Richey with little more than "a warm body with a prefix attached to his name," *Skaggs*, 235 F.3d at 273 n. 3 (quoting *Ramdass v. Angelone*, 187 F.3d 396, 411 n. 1 (4th Cir.1999) (Murnaghan, J., dissenting)). In a case anchored by scientific evidence, the failure to subject this evidence to meaningful adversarial testing was woefully deficient. Moreover, we are unable to articulate any sound professional reason why counsel did not do so. The dissent argues that counsel was obligated to provide DuBois's name as a potential witness, and that the prosecution's use of the defense's expert does not violate the defendant's rights. While we agree that Richey's rights were not violated simply because the State used DuBois as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

its own witness, we believe that given the context here--where the defendant had a single expert *686 witness who conducted no independent analysis and then became the witness for the other side without any cross-examination--there was a massive failure by trial counsel in his handling of the expert witness. Accordingly, we must conclude that counsel's performance was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. The state court's conclusion to the contrary was unreasonable.

**b. Prejudice**

[18] We proceed to measure prejudice. In order to show prejudice, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt about his guilt." *Combs*, 205 F.3d at 290. "A reasonable probability is a probability sufficient to undermine confidence in the trial's outcome." *Foster*, 9 F.3d at 726. In determining whether there was prejudice, we "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. The prejudice inquiry is complicated slightly in this case because trial counsel's errors were twofold: deficiencies plagued both his hiring and handling of DuBois. Under either scenario, however, the evidence of prejudice is overwhelming.

Had counsel made the effort to find a qualified expert, rather than blindly hiring DuBois, the expert would have had the expertise and wherewithal to undermine the State's evidence that the fire was caused by arson. Custer and Armstrong highlighted a litany of irregularities in the State's scientific evidence. First, Custer revealed alternative explanations for the circumstances that led Cryer to finger arson as the culprit, and surmised that the fire was more consistent with an accidental outbreak. Second, Armstrong opined that "there is no evidence of an identifiable ignitable liquid in any of the samples from the fire scenes." Moreover, the blunders that Armstrong highlighted--the State's failure to use accepted methodology, use control groups, and eliminate other explanations, to name a few--would likely have led the factfinder to adopt the defense's understanding of the science.

Custer and Armstrong similarly explained, without

refutation, that the scientific standards upon which they relied were widely accepted in 1986, leaving little doubt that counsel would have been able to find a competent expert had he bothered to look for one. *See Horsley v. Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ("[T]o prove prejudice by failure to investigate and failure to produce a certain kind of expert witness, a habeas petitioner must demonstrate a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced."). Indeed, both Custer and Armstrong averred that they would have served as experts at the time, had they been contacted by counsel.

These experts' attacks on the State's evidence would have been all the more powerful given the absence of corroborating physical evidence. Neither Richey's clothing, boots, or bandage revealed the presence of accelerants. No empty canisters of flammable liquids were found at or around the scene. And the owner of the neighboring greenhouse--from which the State theorized Richey stole the accelerants--was unable to determine whether anything was missing.

Furthermore, even if counsel's initial decision in hiring DuBois was proper, counsel's ineffective handling of DuBois resulted in prejudice to Richey. First, counsel's delays in hiring DuBois, and his arbitrarily limiting the hours that DuBois could work without understanding what type of work needed to be done in this case, made DuBois more dependent on the legwork of the *687 State's experts, whose conclusions he was already predisposed to accept. Moreover, counsel's procrastination forced him to disclose DuBois as a potential witness before he knew whether doing so would benefit his client. The result was that the State was able to present not only the testimony of its own scientists, but also use Richey's own expert against him. *Cf. Bloom*, 132 F.3d at 1278 (finding prejudice when "[expert]'s report, which he now acknowledges was inaccurate, permitted the prosecution to turn Kling's trial testimony against [defendant]").

Second, trial counsel's failure to supervise DuBois left him unaware that DuBois was being spoon-fed results from the State, rather than conducting an

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

Page 23

independent analysis of the data. Counsel's failure to engage DuBois meant that possible deficiencies in the State's evidence were never explored, and also left him wholly unprepared to challenge the State's evidence or to cross examine his own expert as later became necessary. *See Skaggs,* 235 F.3d at 274 (prejudice when "defense counsel failed to prepare or present any other meaningful mitigation evidence that might have compensated for their use of [an unqualified expert]").

Finally, trial counsel's failure to fully inform DuBois about the carpet samples' excursions at the garbage dump and parking lot deprived DuBois of all the information he needed to draw his conclusions, and made him more likely to agree with the conclusions of the State. Indeed, DuBois has subsequently indicated that his conclusions would likely have changed had he been fully informed about the chain of custody problems. *Bloom,* 132 F.3d at 1276 (finding prejudice from failure to disclose information to expert given that "had he been provided with this information at the time of his original evaluation, he would have altered his conclusions").

The record indicates that a competent arson expert--fully informed and supervised, and using the methods available to him at the time of trial--would have all but demolished the State's scientific evidence, and with it a large part of the case against Richey. *See Foster,* 9 F.3d at 722 (finding prejudice because "[i]f the attorney had investigated further, he would have discovered objective medical evidence casting substantial doubt on the victim's story"). The State presented other evidence, of course, which demonstrated Richey's motive, means, and opportunity. But the prejudice inquiry is not the same as the sufficiency of the evidence analysis or the analysis that a court might perform when deciding a motion for summary judgment. As the Fifth Circuit has explained, we need *not* find "that a reasonable jury could not have reached the same verdict if counsel had performed effectively." *Johnson v. Scott,* 68 F.3d 106, 109 n. 4 (5th Cir.1995). Richey "need not show that he could not have been convicted. Instead, he need only undermine our confidence in the trial's outcome." *Foster,* 9 F.3d at 726.

Witnesses, moreover, are not always believed. Just

as an alleged victim's testimony that the defendant had raped her became far less persuasive given evidence that the defendant was impotent and thus physically incapable of raping her, *see id.,* the testimony of Richey's acquaintances and Hope Collins, who had a motive to downplay her own responsibility for her daughter's death, would have been far more vulnerable to impeachment and skepticism absent evidence that the fire stemmed from arson. *See also Combs,* 205 F.3d at 290 (finding prejudice from defense counsel's mishandling of scientific evidence of defendant's mental capacity for acting with "purpose and intent," even though "the State presented other evidence of [defendant]'s purpose and prior calculation and design"); *\*688Baylor v. Estelle,* 94 F.3d 1321, 1324-25 (9th Cir.1996) (finding prejudice from defense counsel's failure to pursue evidence that semen found at scene of the first of a series of rapes did not come from defendant, even though defendant had made detailed confession to the rapes); *cf. United States v. Tarricone,* 996 F.2d 1414, 1419 (2d Cir.1993) (finding prejudice from defense counsel's failure to pursue exculpatory handwriting evidence, even though there was other circumstantial evidence of defendant's guilt).

Accordingly, we find that counsel's incompetent handling of the sole forensic expert in this case fell far below the wide range of acceptable professional standards, and that absent counsel's grave mistakes, there is a reasonable probability that the three-judge panel would have at least had a reasonable doubt as to whether Richey set the fire that ultimately caused the death of Cynthia Collins.

### III. CONCLUSION

Because our holdings above entitle Richey to all the relief that he has sought, we do not consider or decide his other claims. The district court's judgment is **REVERSED**, and the case is **REMANDED** with instructions that a conditional writ of habeas corpus, giving the State of Ohio ninety days to attempt to retry Richey or release him from custody, be **GRANTED**.

SILER, Circuit Judge, dissenting.

I respectfully dissent from the majority's conclusions that there was insufficient evidence against Richey on the charge of aggravated felony

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660                                                                                                      Page 24
395 F.3d 660, 2005 Fed.App. 0039P
(Cite as: 395 F.3d 660)

murder, that this issue was not procedurally defaulted, and that trial counsel was ineffective in his handling of his expert witness, DuBois.

The first issue, insufficiency of the evidence, due to the fact that Richey could not have been sentenced to death for the aggravated felony murder charge under Ohio Revised Code § 2903.01 through transferred intent, is procedurally defaulted. As the majority opinion states, Richey has conceded that he did not raise this claim at trial or on direct appeal. The district court correctly found that this issue was procedurally defaulted. As it said: "Richey did raise an insufficiency of evidence claim to the Ohio Supreme Court, although that claim asserted only that his conviction rested on solely circumstantial evidence." The Ohio Supreme Court discussed transferred intent only as a sub-issue under the issue of circumstantial evidence. *See State v. Richey,* 64 Ohio St.3d 353, 595 N.E.2d 915, 925 (1992). Transferred intent is not one of the issues listed in the certificate of appealability. To the contrary, the district court denied a certificate of appealability on this issue, and we did the same. Therefore, the question of transferred intent can only be approached by this court as a subpart of the certified issue on appeal of the ineffective assistance of appellate counsel either by the failure of appellate counsel to raise the question on direct appeal, or the failure of appellate counsel to raise the question of ineffective assistance of trial counsel for his failure to argue the issue of transferred intent before the trial court.

As the district court correctly found, this assertion is in the nature of a faulty indictment claim, which must be raised prior to trial under Ohio Rule of Criminal Procedure 12. Of course, Richey gets around that barrier by asserting that the Ohio Supreme Court reached the issue of transferred intent, but it was part of its ruling on the sufficiency of the evidence, not as a separate issue. Nevertheless, the majority has accepted Richey's argument of skirting the procedural default by finding that trial counsel was ineffective for failing to challenge the sufficiency of the evidence under this transferred intent issue, and that appellate counsel was ineffective for failing to raise the ineffectiveness of trial *689 counsel on that point. However, that issue was also procedurally defaulted, because of the failure by Richey to timely

reopen his appeal in the Ohio courts under Ohio Rule of Appellate Procedure 26(B), as the Ohio Supreme Court held that the motion was untimely. Nevertheless, assuming that it was not barred by an untimely application under Rule 26(B), as the district court found, I would still find that there was no ineffective assistance of appellate counsel for failing to raise the ineffective assistance of trial counsel on this point of transferred intent. The reason for my conclusion is simple. The Ohio Supreme Court found that the doctrine of transferred intent applied in this case when it said " '[t]he doctrine of transferred intent is firmly rooted in Ohio law.' " *Richey,* 595 N.E.2d at 925 (quoting *State v. Sowell,* 39 Ohio St.3d 322, 530 N.E.2d 1294, 1305 (1988)). It held that the doctrine of transferred intent was applicable under Ohio Revised Code § 2903.01(B). Therefore, had counsel raised the issue before the trial court and preserved it on appeal, the issue would have been lost before the Ohio Supreme Court.

The majority admits that the Ohio Supreme Court ruled that transferred intent is applicable under the charge in this case. However, it has essentially eviscerated the power of the Ohio Supreme Court to interpret its own statutes. It relies upon the language from *State v. Mullins,* 76 Ohio App.3d 633, 602 N.E.2d 769, 771 (1992). However, the language quoted from *Mullins* is *dictum,* for the holding was that the doctrine of transferred intent applied in a case where the defendant was charged under Ohio Revised Code § 2903.02(A). Obviously, the Ohio Supreme Court did not feel bound by it, not only because it was *dictum* but it came from a lower court. Instead, the Ohio Supreme Court interpreted the *Sowell* case and found that transferred intent had always applied in similar cases.

The majority correctly states that the scope of review under AEDPA requires that we uphold the decision of the Ohio Supreme Court unless it: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). I am not certain on which of these prongs the majority has anchored its decision, but it seems to be that it was contrary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

Page 25

to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court. It cites *Fiore v. White,* 531 U.S. 225, 228-29, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), which held that a state criminal conviction violates the Due Process clause of the Fourteenth Amendment when a person is convicted of a crime when the elements of the crime have not been proven beyond a reasonable doubt. In *Fiore,* the crime for which the defendant was convicted was the failure to possess a permit for the operation of a hazardous waste facility. The Commonwealth agreed that it had not proven that basic element. To the contrary, in this case at bar, the State met its burden to prove intent through the doctrine of transferred intent, which was the law in Ohio at the time of this crime, as interpreted by the Ohio Supreme Court.

The majority also relies upon *Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), for the proposition that the Ohio Supreme Court could not retroactively expand the criminal act prohibited under Ohio law. However, the Ohio Supreme Court held that its decision in this case followed the law which had been in Ohio for many years preceding Richey's conviction. Therefore, the Ohio Supreme Court's ruling on transferred intent was neither contrary to nor involved *690 an unreasonable application of clearly established Federal law as determined by the Supreme Court. From *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), under the "unreasonable application" clause,

> a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

I suggest that the Ohio Supreme Court did not make any unreasonable application of clearly established Federal law here, nor was it contrary to *Fiore* or *Bouie.* It is best to leave it up to the Ohio Supreme Court to decide the application of its own laws, so long as it does not do so unconstitutionally. Cf. *Mitchell v. Esparza,* 540 U.S. 12, 17, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous."). Thus, appellate

counsel was not ineffective for not raising ineffective assistance of trial counsel on this issue.

I also respectfully disagree with the majority on its conclusion that Richey was deprived of the effective assistance of counsel at the guilt phase of his trial. The Ohio Court of Appeals found that counsel was not ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *State v. Richey,* 1997 WL 722782, at *3 (Ohio Ct.App.1997). Therefore, because it correctly identified *Strickland* as the authoritative case governing Richey's claim, we must decide whether its application of the *Strickland* standard was "objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495. It is Richey's "burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti,* 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)(*per curiam* ).

I agree with the majority that this issue is not procedurally defaulted, due to the fact that the Ohio Court of Appeals ruled on it and the circumstances of this claim depend on evidence outside the trial record. However, I disagree with the majority on the issue of deficient performance, so I do not discuss the question of prejudice as an alternative basis except for one minor point. The majority finds several errors amounting to ineffective assistance on the selection and use of the expert witness, DuBois. The majority concludes that DuBois was unqualified for several reasons. However, in *Skaggs v. Parker,* 235 F.3d 261, 272 (6th Cir.2000) , we noted that a claim "that the petitioner is entitled to a competent expert in his defense," has never been "explicitly adopted by this Court." *Accord Campbell v. Coyle,* 260 F.3d 531, 550-51 (6th Cir.2001). The record does not support Richey's allegation that counsel retained DuBois without performing an adequate background check. Richey makes much of DuBois's academic inexperience in the fields of forensic science and fire investigation, but it appears that his in-class training consisted of courses in fire investigation taught by members of the Ohio Fire Marshal's Office, the very entity he was hired to critique. There is no suggestion in the record that counsel was put on notice that DuBois was either incompetent or unqualified to serve as Richey's expert. The majority infers that it was wrong to find him through a promotional flier, but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

Page 26

that does not disqualify an expert. After counsel contacted DuBois and discussed some of the facts of the case, DuBois sent a follow-up letter explaining the services he and his employer would provide. The letter included the fact that his business would "investigate the cause and origin of a fatal apartment fire." It would "include a visit to the fire *691 scene, review of available information and reports, and a preliminary report of our findings." He also estimated that he could do it in ten hours. DuBois listed his company's services, which included fire and explosions investigations. Nothing in his resume or company profile indicated that he was either incompetent or unqualified to serve as an expert. Moreover, DuBois indicated that his company was involved in approximately 400-500 fire investigations prior to 1987 and he played some role in almost all of them. In 1986 alone, DuBois was involved in 10-30 arson investigations. Based on the foregoing, it cannot be said that the decision to hire DuBois was "objectively unreasonable" pursuant to *Strickland.* Although his classroom training in forensic science and fire investigation was fairly limited, counsel could not have been on notice of such limitations, and any academic inadequacies seemed to have been compensated for with practical field experience. Obviously, there may have been experts out there somewhere who were better qualified, but the law does not require counsel to search throughout the world to find the best expert in the field and hire him. *See Sidebottom v. Delo,* 46 F.3d 744, 753 (8th Cir.1995).

The majority also finds fault in counsel's delay in meeting with DuBois and limiting the initial investigation to ten hours. However, these sub-claims were never raised in State court, so they were procedurally defaulted. Even if these sub-issues were not procedurally defaulted, the claims cannot prevail on the merits. Although counsel's delay in providing DuBois with the State's scientific report and data prevented DuBois from conducting an independent test of the extracts, Richey has not argued that counsel knew of or should have known of the short lifespan of the extracted compounds. This is not a situation where an attorney was aware of a particular risk and ignored it; rather, this is a situation where only with the benefit of hindsight that counsel's delay could have been harmful. The Supreme Court has warned

that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Moreover, Dr. Armstrong testified that his review of the data suggests that there were no extracts available to be tested following the State's initial test. That is, the State's original tests used up all the extracts. Thus, regardless of how soon counsel could have insisted that DuBois conduct his own tests, no tests could have been performed. Richey has not alleged that the State violated any laws in the course of conducting the tests. Furthermore, the fact that extracts were not available in this case did not prevent Dr. Armstrong from later rendering an opinion as to the accuracy and validity of the State's tests.

The limitation of ten hours for the work of the expert shows nothing. Richey has not shown prejudice under *Strickland.* DuBois testified that he spent more than ten hours on the case and his biggest limitation was not being able to see the fire scene carpeting, which was not the result of counsel's alleged ineffectiveness.

The majority also criticizes counsel's failure to inform DuBois about the fact that the carpet was removed from a dumpster on a parking lot located near gasoline pumps. But DuBois was ambiguous about this. In his deposition, he said he probably knew it. He also said:

> I do recall [counsel] told me that the carpeting had been thrown out and--I probably misstated whether or not he told me it had been sampled and then thrown in the dumpster or thrown in the dumpster then sampled. But I did know that there was some questionable *692 handling of the carpeting after the fire, and [counsel] was rather upset about it.

Counsel also raised this at trial. Therefore, it is unclear whether counsel withheld this information from DuBois. Thus, Richey has not carried the burden to show this conduct to be objectively unreasonable behavior.

Next, the majority criticizes the fact that trial counsel placed DuBois on his witness list and then failed to mitigate the mistake. Although counsel did not have DuBois's report, he was obligated to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

395 F.3d 660                                                                                                              Page 27
395 F.3d 660, 2005 Fed.App. 0039P
**(Cite as: 395 F.3d 660)**

disclose the name of this witness under the Ohio Criminal Rules. He had a tactical reason for disclosing the name of the expert, so he was not ineffective by making such a disclosure. Moreover, counsel was not ineffective for failure to quash the subpoena or otherwise contest his testimony. The Ohio Supreme Court discussed the underlying merits of that issue. *See Richey,* 595 N.E.2d at 922-23. It indicated that the prosecution's use of a defense expert does not violate the rights of an accused, unless there is a disclosure of confidential communications between the attorney and the client. In this case, there were no such problems. Therefore, any objection or attempt to quash the subpoena would have been unsuccessful. If counsel was thinking of the possibility of calling DuBois as a witness, he had to list his name, even when he did not yet have DuBois's report. Otherwise, had DuBois filed a report favorable to Richey, counsel may not have been able to use DuBois.

Finally, the majority criticizes counsel for failing to offer any competing scientific evidence or to screen, supervise, or engage DuBois. However, counsel does not have a duty to "continue looking for experts just because the one he has consulted gave an unfavorable opinion." *Dees v. Caspiri,* 904 F.2d 452, 454 (8th Cir.1990)(per curiam). Unless a defense attorney has reason to doubt the objectivity of an expert, the failure to obtain a new "impartial" expert will not be objectively unreasonable. *See Jones v. Murray,* 947 F.2d 1106, 1112 (4th Cir.1991). DuBois reviewed the results of the tests from the State's expert and agreed with them. There was nothing to indicate to counsel that the results were not correct. The Supreme Court has indicated that post-AEDPA claims of ineffective assistance of counsel will succeed only in limited circumstances. In *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), the Court stated:

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the ... Court ... applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-99, 122 S.Ct. 1843 (internal citations

omitted). Richey has not done that here. Therefore, I would not find that the decisions of the Ohio courts were contrary to or unreasonable applications of Federal law as interpreted by the Supreme Court. Thus, I would affirm the decision of the district court in denying the petition for a writ of habeas corpus.

395 F.3d 660, 2005 Fed.App. 0039P

**Briefs and Other Related Documents (Back to top)**

. 01-3477  (Docket)

(May. 08, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.